Carl C. DAVIS, Jr., M.D. and
Carl C. Davis, Jr., M.D.,
P.A., Appellants,

v.

The METHODIST HOSPITAL; Baylor
College of Medicine; Larry L. Mathis;
Harper Jackson; Ronald Girotto;
John C. Baldwin, M.D.; Stuart M.
Dobbs, M.D.; Donald G. Weilbaecher,
M.D.; Bobby R. Alford, M.D.; Lee Ly-
man D. Tuttle, M.D.; Charles H.
McCollum, M.D.; and Michael J.
Reardon, M.D., Appellees.

No. 01–98–00419–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

July 15, 1999.

Rehearing Overruled Aug. 20, 1999.

David L. Monroe, Able, Monroe & Walerk, P.C., Houston, for appellant.

Earnest W. Wotring, Mayor, Day, Caldwell & Keeton, L.L.P., Paul E. Stallings, Gwen Samora, Vinson & Elkins, L.L.P., Houston, for appellee.

Panel consists of Chief Justice SCHNEIDER, and Justices O'CONNOR and TAFT.

## OPINION

TIM TAFT, Justice.

On July 8, 1999, this Court issued an opinion in this cause. We withdraw that opinion and issue this opinion in its place.

Appellee, The Methodist Hospital (the Hospital), suspended, and later terminated, the clinical privileges of appellant Carl C. Davis, Jr., M.D. In two reports, the Hospital reported to the National Practitioner's Data Bank that Dr. Davis had been suspended, and later terminated, for

incompetence. Dr. Davis believed these reports were false. Therefore, he and his professional association, Carl C. Davis, Jr., M.D., P.A. (hereinafter collectively referred to as "Dr. Davis"), sued the Hospital for libel. The Hospital moved for, and was granted, summary judgment on Dr. Davis's libel claim. We address whether the trial court erred by granting summary judgment for the Hospital on the ground that the Hospital was immune from liability for filing the reports, under the Health Care Quality Improvement Act (the Health Care Act).[1] We affirm.

## Factual and Procedural History

In 1992, Dr. Davis moved his practice to the Hospital. On March 2, 1994, Dr. Davis performed surgery on Lineal Barnett to relieve a bowel obstruction. During the surgery, a fragment of Barnett's liver came loose, causing massive bleeding. Dr. Davis was unable to control the bleeding, and called for emergency assistance. When assistance did not arrive, Dr. Davis was presented with the problem that he needed one hand to stop the bleeding, which left only one hand to continue the operation. Therefore, Dr. Davis had to choose between continuing to wait for assistance, thus leaving the area of surgery open, or using his left hand to control the bleeding and his right hand to continue the operation. Not knowing when assistance would arrive, Dr. Davis chose the latter. During this one-handed operation, Dr. Davis inadvertently caused a tear in Barnett's portal vein. Over one hour after Dr. Davis's initial call for emergency assistance, Dr. Michael Reardon arrived to help Dr. Davis. Despite the doctors' efforts to remedy the complications, Barnett died within hours of the operation.

Later the same day, Dr. Davis was given written notice that "due to the serious problems which occurred ... during the surgery on Lineal L. Barnett," the Hospital suspended Dr. Davis's admission, consultation, and surgical privileges. On March 4, 1994, at the behest of the Hospital's Medical Executive Committee (Executive Committee), the Hospital's Credentials Committee (Credentials Committee) met to initiate an investigation of Dr. Davis. On April 18, 1994, after hearing testimony and reviewing records, the Credentials Committee made the following findings and recommendation:

> In its deliberations, the Committee acknowledged that its first priority must be the safety of the patients. The Committee expressed concern about [Dr. Davis's] continued insistence that he had not cut the portal structures, despite the pathology findings and his own operative note. There was a great deal of concern that [Dr. Davis] could not admit that he had made a mistake and did not ask for assistance when he got in over his head. The Committee has strong reservations about [Dr. Davis's] surgical skills, as well as his judgment. There is concern about [Dr. Davis's] ability to know when he needs assistance. The Committee did not feel that [a] corrective action plan could be designed to effectively insure adequate patient safety or which would correct [Dr. Davis's] poor surgical technique and judgment.
>
> Therefore, based on the total review of [Dr. Davis's] practice at [the Hospital], the Committee voted unanimously to recommend to the [Executive Committee] that the staff membership and clinical privileges of [Dr. Davis] be terminated.

On April 22, 1994, the Executive Committee notified Dr. Davis it had accepted the Credentials Committee's recommendation, and would therefore recommend to the Hospital's Board of Directors that Dr. Davis's clinical privileges be terminated, based on:

> [His] medical and surgical skills and judgment involving [Barnett] and other

---

1. Dr. Davis filed a motion with this Court, which we granted, to dismiss all appellees other than TMH.

cases identified by the Credentials Committee;

Inconsistencies between [his] operative report and account of the surgery of [Barnett] and other records and reports of that surgery considered by the Credentials Committee;

The number and seriousness of complications experienced by [his] patients;

Poor documentation of [his] medical practice, including sloppy record keeping, failure to provide dates and times for [his] medical record entries, inadequate histories and physical examinations, and poor discharge summaries; and

Failure to address laboratory results in conjunction with the treatment of [his] patients.

In the same notice, the Executive Committee notified Dr. Davis that he was entitled to a hearing on the Executive Committee's recommendation, upon request. Dr. Davis requested a hearing.

The Hospital appointed a Peer Review Committee to review the basis for the Credentials Committee and Executive Committee's recommendation. After hearing testimony and reviewing documents, the Peer Review Committee made the following findings concerning the Executive Committee's reasons for its recommendation that Dr. Davis's clinical privileges be terminated: [2]

Although the issues initially raised by the [Barnett] case ... were sufficient to support the recommendations of the Credentials Committee and the Executive Committee, the full review of that case by the Hearing Committee reveals evidence that is so inconclusive as to be ultimately non-supportive of the recommendations. However, while everyone agrees that the outcome of [Barnett] was catastrophic, hours of conflicting testimony about the case did not clearly describe what happened in the case, or exactly what the case reveals about [Dr.

Davis's] surgical skills and judgment. Therefore, because the testimony was so conflicting and inconsistent, the Hearing Committee is unable to conclude that [Dr. Davis] meets the standards of the Active Medical Staff.

The Hearing Committee agrees that there were complications in [Dr. Davis's] patients. We found, however, in the detailed review of each case as well as testimony from witnesses that there were differing opinions about the level of severity of these complications. In general the Hearing Committee felt that both the severity and the incidence of the complications could fall within acceptable standards of care of other similar practitioners within the Hospital. However, because the testimony was so inconsistent, the Hearing Committee is unable to conclude that [Dr. Davis] meets the standards of the Active Medical Staff.

The Hearing Committee agrees with the charge of the poor documentation in many of the records of [Dr. Davis]. We were not, however, able to find evidence of any particular case where poor documentation led to an adverse patient outcome. We believe that good documentation reflects good patient care, and agree that [Dr. Davis] must be held accountable to the standard of care of documentation that exists in the Hospital. Therefore, over all, we are unable to conclude that [Dr. Davis] meets the standards of the Active Medical Staff. Although [Dr. Davis] clearly often failed to address laboratory results in conjunction with the treatment of his patients, and these failures were sufficient to support the recommendations of the Credentials Committee and the Executive Committee, the full review by the Hearing Committee revealed that, fortunately, the failures did not lead to outcomes adverse enough ultimately to support

---

2. Throughout the Peer Review Committee's findings and recommendation, it refers to itself as the "Hearing Committee."

the recommendations. These and other documentation problems initially made it difficult to follow the thought processes of [Dr. Davis], and, called his judgment into question. Again, full review demonstrated insufficient reason for the specific recommended action. Over all, however, we are still not able to conclude that [Dr. Davis] meets the standards of the Active Medical Staff.

These findings resulted in the Peer Review Committee's coming to the following conclusion and recommendation:

> The Hearing Committee feels strongly that, while the evidence may not have supported all of the specific charges, the extent of dispute and debate means we cannot explicitly conclude that the practitioner is within acceptable guidelines. Therefore, we conclude that [Dr. Davis] has weaknesses in the practice that require heightened scrutiny, but we do not agree with the specific recommendations of the Credentials Committee and the Executive Committee. Instead, the Hearing Committee recommends that [Dr. Davis] be allowed to continue in his current Provisional Staff membership level, with his current clinical privileges, but only while he practices under a plan of close observation specifically developed by the Chief of Surgery.

On May 6, 1995, after reviewing the Peer Review Committee's recommendation, the Executive Committee notified Dr. Davis that it had chosen to reject the Peer Review Committee's recommendation and would uphold the Credentials Committee and Executive Committee's original recommendation that Dr. Davis's clinical privileges be terminated. In the same notice, the Executive Committee notified Dr. Davis that he was entitled to an appellate review of the Executive Committee's recommendation, upon request. Dr. Davis requested an appellate review.

On June 14, 1995, before appellate review of the Executive Committee's recommendation, Claire W. Reid, the Hospital's Director of Medical Staff Services, filed an adverse action report with the National Practitioner's Data Bank. This report provided notification of the Hospital's March 2, 1994 suspension of Dr. Davis's clinical privileges. On the report, in the space designated for placement of an adverse action classification code, Reid placed "630.02." This code corresponds to suspension of clinical privileges for "Incompetence/Malpractice/Negligence." In the section of the report designated for a description of the acts, omissions, or other reasons for suspension, Reid wrote the following:

> Dr. Davis was summarily suspended on 3/2/94 due to an unexpected surgical death. After investigation, Credentials [Committee] recommended termination of Staff membership. Executive [Committee] (MEC) accepted that recommendation [and] Dr. Davis requested a hearing. The Hearing Committee held nine meetings [and] recommended reinstatement with monitoring plan to be developed by the Chief of Surgery. The Chief determined that such a plan was not practicable. MEC rejected the recommendation of the Hearing Committee [and] upheld the recommendation of the Credentials [Committee and] MEC that membership be terminated. Appellate review is pending.

On July 31, 1995, the Appellate Review Body met and began reviewing the transcripts of the Peer Review Committee's hearings and the documentation reviewed by the Peer Review Committee to determine the propriety of the Executive Committee's decision to reject the Peer Review Committee's recommendation. On September 27, 1995, the Appellate Review Body issued a report with the following recommendation:

> To affirm the recommendation of the Executive Committee of the Medical Staff of The Methodist Hospital and recommend to the Board of Directors that the Medical Staff membership and clinical privileges of Dr. Carl C. Davis, Jr., be terminated.

On October 4, 1995, the Hospital notified Dr. Davis that the Hospital's Board of Directors had reviewed the Appellate Review Body's recommendation and chosen to accept it. In the same notice, the Hospital notified Dr. Davis that it had terminated his clinical privileges, effective September 27, 1995.

On October 13, 1995, the Hospital filed another adverse action report with the National Practitioner's Data Bank. This report provided notification of the Hospital's September 27, 1995 termination of Dr. Davis's clinical privileges. In the space of the report designated for placement of an adverse action classification code, Reid again placed "630.02." In the context of termination of clinical privileges, this code corresponds to termination of clinical privileges for "Incompetence/Malpractice/Negligence." In the section of the report designated for a description of the acts, omissions, or other reasons for termination, Reid stated:

> The appellate review for Carl C. Davis, Jr., M.D. was held on 7/31/95. The Appellate Review Body affirmed the recommendation of the Medical Executive Committee and voted to recommend to the Board of Directors that Dr. Davis'[s] membership and clinical privileges be terminated. The Board of Directors of The Methodist Hospital met on 9/27/95, and considered the recommendation of the Appellate Review Body. It was the decision of the Board to accept the recommendation of the Appellate Review Body. Dr. Carl C. Davis, Jr., was deleted from the Medical Staff of The Methodist Hospital, effective 9/27/95.

Dr. Davis sued the Hospital for libel, based on the sections of the June 14, 1995 and October 13, 1995 reports that stated his clinical privileges were suspended and later terminated for "Incompetence/Malpractice/Negligence." The Hospital moved for an ordinary summary judgment under rule 166a(c) and a no-evidence summary judgment under rule 166a(i). The Hospital based its motion for ordinary summary judgment on its assertion of immunity under the Health Care Act and the Texas Medical Practice Act. The Hospital based its no-evidence motion for summary judgment on its assertion there was no evidence that the Hospital's statement in its report to the National Practitioner's Data Bank was false and without legal excuse. Dr. Davis responded by asserting the Hospital's reports were false and that Reid knew the reports were false when she completed them.

## Jurisdiction

■ The Hospital contends Dr. Davis has not exhausted all of his administrative remedies, and, therefore, that the trial court lacked subject-matter jurisdiction over Dr. Davis's libel claim, which this Court also lacks. In response, Dr. Davis contends the Hospital waived this complaint by raising it for the first time on appeal. Because a trial court's lack of subject matter jurisdiction can be raised for the first time on appeal, we address the Hospital's argument. *Texas Ass'n of Business v. Texas Air Control Board*, 852 S.W.2d 440, 445 (Tex.1993).

■ When Congress mandates that a claimant exhaust administrative remedies, the mandate is the equivalent of a legislative investiture of exclusive original jurisdiction in the administrative agency. *Taylor v. United States Treasury Department*, 127 F.3d 470, 475 (5th Cir.1997). The exhaustion of administrative remedies thus becomes a jurisdictional issue. *Id.* Conversely, when there is no such provision in a statute, there is no jurisdictional issue. *Id.* In the present case, the Health Care Act does not contain an express statutory requirement that a claimant exhaust administrative remedies. *See* 42 U.S.C. §§ 11101–52 (1994). Therefore, we conclude the trial court had subject matter jurisdiction over this case, as does this Court.

## Summary Judgment

In his sole issue on appeal, Dr. Davis contends the trial court erred by granting

the Hospital's motion for summary judgment.

## A. Standard of Review

■ Summary judgment is proper only when a movant establishes there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995); *Phillips Natural Gas Co. v. Cardiff,* 823 S.W.2d 314, 317 (Tex. App.—Houston [1st Dist.] 1991, writ denied). When reviewing a summary judgment record, we indulge every reasonable inference in favor of the nonmovant, assume all evidence favorable to the nonmovant is true, and resolve any doubts in the nonmovant's favor. *Randall's Food Mkts., Inc.,* 891 S.W.2d at 644. Further, when a summary judgment order does not specify the ground or grounds relied on for the ruling, as in this case, we will affirm the judgment if any one of the theories advanced in the motion is meritorious. *State Farm Fire & Cas. Co. v. S.S.,* 858 S.W.2d 374, 380–81 (Tex.1993).

## B. Federal Immunity

■ In its motion, the Hospital relied on section 11137(c) of the Health Care Act, which confers immunity on any person who makes a report to the National Practitioner's Data Bank "without knowledge of the falsity of the information contained in the report." 42 U.S.C. § 11137(c) (1994). The Federal Tenth Circuit Court of Appeals has interpreted section 11137(c) in the context of a jury trial in which a defendant asserted immunity. *Brown v. Presbyterian Healthcare Servs.,* 101 F.3d 1324, 1334 (10th Cir.1996). In that context, the *Brown* Court concluded that "immunity for reporting exists as a matter of law unless there is sufficient evidence for a

jury to conclude the report was false and the reporting party knew it was false." *Id.* Applying the *Brown* court's conclusion in the context of a defendant moving for summary judgment on the basis of section 11137(c) immunity, we conclude a summary judgment movant would have the burden to establish either of the following:

(1) the report was true;[3] or
(2) if the report was false, when the reporting party completed the report, the reporting party did not know the report was false.

In the Hospital's motion for summary judgment, it claimed that its National Practitioner's Data Bank adverse action reports accurately reflected the actions taken by the Hospital and the basis for those actions.

In *Brown,* the hospital terminated a doctor's clinical privileges based on her having breached an agreement with the hospital, which provided she was to obtain appropriate consultation before treating certain patients. *Id.* at 1327–28. The hospital's adverse action report to the National Practitioner's Data Bank reflected that the doctor's clinical privileges were terminated based on the doctor's Incompetence/ Malpractice/Negligence. *Id.* at 1328. The doctor sued the hospital's administrator for libel, claiming the report of termination based on Incompetence/Malpractice/ Negligence was false. *Id.* at 1327. In response, the hospital's administrator asserted section 11137(c) immunity. *Id.* at 1334. To determine whether the hospital's adverse action report was true, the court examined the reasons for termination, as stated by the defendant hospital's review panel and board of trustees. *Id.* The court found there was sufficient evidence from which a reasonable jury could have con-

---

3. Our use of the word "true," does not refer to the truth of whether the person, to whom the report applies, engaged in the activity reported or possessed the attributes reported. We use the word "true" only to refer to whether the report accurately reflected what occurred. For example, in this case, the Hospital's adverse action report to the National

Practitioner's Data Bank reflected that the Hospital suspended, and later terminated, Dr. Davis's clinical privileges based upon the Hospital's conclusion that he was incompetent, negligent, or guilty of malpractice. Therefore, we do not address whether Dr. Davis actually was incompetent, negligent, or guilty of malpractice.

cluded that the adverse action report was false and that the reporting party knew of the report's falsity. *Id.* As in *Brown,* we will determine the veracity of the Hospital's report by referring to the Hospital Board of Directors' stated reasons for the adverse actions taken against Dr. Davis.

The Hospital attached to its motion for summary judgment a copy of its notice to Dr. Davis that his clinical privileges were terminated. In the notice, the Hospital stated its decision was based on the Hospital Board of Directors' decision to follow the Appellate Review Board's recommendation that the Credentials Committee's findings and recommendation be followed. As set out above, the Credentials Committee concluded Dr. Davis had poor surgical technique and judgment. This conclusion was based on the following:

(1) concern about Dr. Davis's continued insistence he had not cut Barnett's portal structures, despite the pathology findings and Dr. Davis's own operative note;

(2) concern that Dr. Davis could not admit he made a mistake in the Barnett case and that he did not ask for assistance when he got in over his head;

(3) concern about Dr. Davis's ability to know when he needs assistance;

(4) strong reservations about Dr. Davis's surgical skills, as well as his judgment.

As a result of the Credentials Committee's conclusion that Dr. Davis had poor surgical technique and judgment, it recommended that Dr. Davis's clinical privileges be terminated. After reviewing the Credentials Committee's findings and conclusion, we conclude the Credentials Committee's recommendation amounted to a finding that Dr. Davis was, at a minimum, incompetent. This was one of the possible corresponding descriptions for the 630.02 code that the hospital placed on its National Practitioner's Data Bank adverse actions reports. Therefore, the Hospital's summary judgment evidence was sufficient to establish the Hospital's reports were true.

Once the Hospital established that its reports were true, the burden shifted to Dr. Davis to present sufficient evidence to create a genuine issue of material fact as to whether the Hospital's reports were true. To satisfy this burden, Dr. Davis relied on affidavits from persons who spoke to Reid and the Hospital's legal counsel, Richard Cheney. The affiants stated Cheney and Reid told them no finding of incompetence, negligence, or malpractice was ever made. Dr. Davis also relied on an affidavit from one of the Peer Review Committee members, who stated the Peer Review Committee did not find that Dr. Davis was negligent, incompetent, or guilty of malpractice. Finally, Dr. Davis relied on affidavits by several doctors who evaluated Dr. Davis's history and concluded no reasonable practitioner could have determined that Dr. Davis was negligent, incompetent, or guilty of malpractice.

## 1. Cheney's Opinion

■ The first affidavit on which Dr. Davis relied concerning Cheney's statements was that of Ronald Wardell, an attorney who represented Dr. Davis after he learned of the June 14, 1995, report. In his affidavit, Wardell states that he contacted Cheney in July 1995 and that Cheney said:

[H]e knew that there was no finding of "Incompetence/Malpractice/ Negligence" with regards to Dr. Davis and since the Peer Review Committee had found just the opposite, the Methodist Hospital's use of the code 630.02[did] not apply to Dr. Davis.

The second affidavit on which Dr. Davis relied concerning Cheney's statements was that of Dr. Davis. In his affidavit, Dr. Davis stated he contacted Cheney in July 1995 and had the following conversation:

I told Mr. Cheney that no one had found me guilty of "Incompetence/ Malpractice/Negligence," or actually ever accused me of the same. Mr. Cheney agreed.

He said that the only reason that I didn't get my privileges back was because Dr. John Baldwin, the Chief of Surgery said that it was impracticable to monitor my surgical cases. He said that there were only so many codes to choose from and that "we" had sent the information to Ms. Claire Reid and that it had been Ms. Claire Reid who did the actual reporting.

Mr. Cheney said he knew that the code for "Incompetence/Malpractice/ Negligence" did not fit my case and that no finding of "Incompetence/ Malpractice/Negligence" had been made. He suggested that Methodist knew that wasn't the case; however, he said as he didn't do the actual reporting and that I should call Ms. Reid.

I suggested to Mr. Cheney that it would be more appropriate to use the code for "Other." Mr. Cheney agreed with me that "Other" would be the appropriate code to use.

The third affidavit on which Dr. Davis relied concerning Cheney's statements was that of Robert N. Meals, an attorney who represented Dr. Davis between August 1994 and the fall of 1995. In his affidavit, Meals stated the following:

Shortly after June 14, I contacted Richard Cheney, General Counsel for The Methodist Hospital, and pointed out that the National Practitioner Data Bank Report was false and needed to be changed. I discussed changing the code 630.02 ("Incompetent/Malpractice/Negligence") to "Other." Mr. Cheney acknowledged the 630.02 code was incorrect and said he would see what he could do about it. The next time I spoke with Richard Cheney, he said that Methodist Hospital would not change the code. Subsequently, Dr. Davis wrote Mr. Cheney a letter on July 31, 1995, demanding that the report to the National Practitioner Data Bank be corrected. It never was corrected.

The basis of the June 14, 1995, report was the Executive Committee's acceptance of the Credentials Committee's findings and recommendation. The basis of the October 13, 1995, report was the Hospital Board of Directors' acceptance of the Appellate Review Body's recommendation that the Hospital Board of Directors accept the Executive Committee's recommendation. Because the Executive Committee based its decision to recommend termination on its acceptance of the Credentials Committee's findings and recommendation, and the Hospital Board of Directors based its decision to terminate on its acceptance of the Executive Committee's recommendation, we conclude Dr. Davis's ultimate termination resulted from an acceptance of the Credentials Committee's findings of incompetence. Accordingly, for Cheney's statements to have raised a genuine issue of material fact as to the truth of the reports, Cheney must have based his statements on his personal knowledge of the Credentials Committee's findings.

The summary judgment evidence does not reflect that Cheney served on the Credentials Committee. Further, Cheney's statement to Wardell reflects Cheney's opinion was based on the Peer Review Committee's findings, not the Credentials Committee's findings. Cheney's statements to Davis and Meals do not reflect the basis of Cheney's opinion. We conclude that Cheney's opinion concerning the findings of the Credentials Committee, when there is no evidence he was a member of that committee, without more, is not sufficient summary judgment evidence to raise a genuine issue of material fact as to whether the Hospital suspended and later terminated Dr. Davis's clinical privileges based on incompetence in the areas of surgical skills, surgical technique, and professional judgment. Accordingly, Cheney's opinion was not sufficient to raise a genuine issue of material fact as to whether the Hospital's reports were true.

**2. Reid's Opinion**

■ Dr. Davis relied on his own affidavit as evidence of Reid's statements. In

his affidavit, Dr. Davis stated the following:

> I called Ms. Reid. She told me that she knew that the code for "Incompetence/Malpractice/Negligence" wasn't the proper code for my case but that she had not known how to report it and that she had called Mr. Cheney for direction. She told me that Mr. Cheney had chosen the code and had specifically directed her to report it as "Incompetence/Malpractice/Negligence." She was very specific in telling me that the choice of code had been selected by Mr. Cheney.

We have concluded that Dr. Davis's ultimate termination resulted from acceptance of the Credentials Committee's findings of incompetence. Accordingly, for Reid's statements to raise a genuine issue of material fact as to the truth of the Hospital's reports, Reid must have based her statements on her knowledge of the Credentials Committee's findings.

Like Dr. Davis's summary judgment evidence concerning Cheney's statements, the summary judgment evidence concerning Reid's statements does not reflect that she served on the Credentials Committee. Further, Reid's statement does not reflect the basis of her opinion. Therefore, we conclude Reid's opinion concerning the findings of the Credentials Committee, when there is no evidence she was a member of that committee, without more, is not sufficient summary judgment evidence to raise a genuine issue of material fact as to whether the Hospital suspended and later terminated Dr. Davis's clinical privileges based on incompetence in the areas of surgical skills, surgical technique, and professional judgment. Accordingly, Reid's opinion was not sufficient to raise a genuine issue of material fact as to whether the Hospital's reports were true.

### 3. Affidavit From Peer Review Committee Member

■ The Hospital's June 14, 1995, report was based on the Executive Committee's acceptance of the Credentials Committee's findings and recommendation and rejection of the Peer Review Committee's findings and recommendation. The Hospital's October 13, 1995, report was based on the Board of Directors' decision to accept the Appellate Review Body's recommendation. The Appellate Review Body's recommendation was to affirm the Executive Committee's decision to reject the Peer Review Committee's recommendation and, instead, to follow the Credentials Committee's findings and recommendation. Therefore, neither report resulted from a Peer Review Committee finding. As a result, we conclude the affidavit from the Peer Review Committee member does not raise a genuine issue of material fact as to whether the Hospital suspended and later terminated Dr. Davis's clinical privileges based on his incompetence in the areas of surgical skills, surgical technique, and professional judgment. Accordingly, the affidavit from the Peer Review Committee member was not sufficient to raise a genuine issue of material fact as to whether the Hospital's reports were true.

### 4. Other Doctors' Opinions

■ By relying on the opinions of other doctors as to whether a reasonable practitioner could have determined that Dr. Davis was negligent, incompetent, or guilty of malpractice, Dr. Davis asked the trial court to delve into the medical judgments underlying the Hospital's decision to take the adverse actions reported, i.e., suspending and later terminating Dr. Davis's clinical privileges. In *Monroe v. AMI Hospitals of Texas, Inc.*, the doctor made a similar request. 877 F.Supp. 1022, 1027 (S.D.Tex.1994). In *Monroe*, as in the present case, the reviewing committee of the hospital recommended that the hospital terminate the doctor's clinical privileges. *Id.* at 1025. This recommendation was based on "concerns about the doctor's professional competence and judgment in providing patient care." *Id.* at 1027. The hospital reported this recommendation. *Id.* at 1031. The doctor believed this report was false, and therefore sued the hospital for libel. *Id.* The hospital moved for summary judgment asserting immunity

798 ∎

under section 11137(c). *Id.* The doctor responded by asserting that because statements made by witnesses during the reviewing committee's consideration were false, the hospital's reporting of the adverse recommendation was also false, and therefore the hospital was not immune. *Id.* The *Monroe* Court concluded the doctor's response attacked the medical judgments underlying the reviewing committee's adverse recommendation, instead of attacking the report's veracity, as required. *Id.* Accordingly, the court granted summary judgment. *Id.* As in *Monroe,* we will not review the medical judgments underlying the actions the Hospital took against Dr. Davis. Our concern is with whether the summary judgment evidence established, as a matter of law, that the Hospital's reports were true. In the present case, Dr. Davis's evidence, in the form of affidavits from doctors who gave their opinion as to whether a reasonable practitioner could have determined that Dr. Davis was negligent, incompetent, or guilty of malpractice, is an attack on the medical judgments underlying the Credentials Committee's adverse recommendation. Therefore, when determining the veracity of the Hospital's reports, we will not consider this evidence.

Having concluded that Dr. Davis's summary judgment evidence did not raise a genuine issue of material fact as to whether the Hospital's reports were true, we conclude the trial court properly granted the Hospital's motion for summary judgment. This conclusion obviates any need to review the trial court's granting of the Hospital's motion for a no-evidence summary judgment. Accordingly, we overrule appellant's sole issue on appeal.

### Conclusion

We affirm the judgment of the trial court.