Michel K. STEPHAN, M.D., Appellant,

v.

BAYLOR MEDICAL CENTER
AT GARLAND, Appellee.

No. 05–99–00476–CV.

Court of Appeals of Texas,
Dallas.

June 22, 2000.

error or on any statutory authorization.

Robert E. Luxen, Jennifer R. Poe, Hallett & Perrin, P.C., Dallas, for Appellant.

Larry Hallman, Joann N. Wilkins, Burford & Ryburn, L.L.P., Dallas, for Appellee.

Before Justices LAGARDE, MORRIS, and O'NEILL

## OPINION

JOSEPH B. MORRIS, Justice.

This case involves a dispute between a doctor and a hospital over staff privileges. The trial court granted a summary judgment in favor of Baylor Medical Center at Garland on all claims brought against it by Dr. Michel K. Stephan. Stephan brings this appeal challenging the trial court's judgment as well as an order denying him discovery. We conclude the trial court was correct in granting summary judgment for the hospital on a number of Stephan's claims, but erred in doing so on others. We further conclude that, to the extent Stephan sought to compel discovery for the claims properly disposed of by summary judgment, the trial court did not abuse its discretion in denying Stephan's discovery requests. Accordingly, we affirm the trial court's judgment in part and reverse it in part. We remand the cause to the trial court for further proceedings.

### I.

In September 1991, Dr. Michel K. Stephan applied for staff privileges at Baylor Medical Center at Garland and began practicing medicine at the hospital provisionally while his application was being reviewed. Stephan's application was processed by the credentials committee of the Baylor medical staff, which reviewed Stephan's professional background. As part of its review, the committee requested records from Stephan on eight specific cases that were the subject of an investigation conducted by the Texas Board of Medical Examiners. These records were reviewed by Baylor physicians, who reported their findings to the committee.

In August 1992, the credentials committee recommended to the hospital's staff executive committee that Stephan's application for staff privileges be denied. The executive committee then notified Stephan by letter that it intended to recommend to the Baylor board of trustees that his application be denied. The letter stated that the committee's recommendation was based on concerns about the quality of Stephan's care and his medical record documentation. In the letter, the executive committee also advised Stephan of his right to a hearing on the proposed action. Stephan was told the hearing would be before an officer appointed by Baylor and he had the right to be represented by an attorney, to call and cross-examine witnesses, to present evidence, and to submit a written statement. Stephan requested a hearing.

The hearing began on February 17 and concluded on March 12, 1993. Dr. Ronald C. Jones, Chief of Surgery at Baylor University Hospital, acted as hearing officer. Stephan was represented by counsel and presented several witnesses who testified about his skills as a doctor, the quality of his medical record documentation, and the quality of his care on the eight specific cases reviewed by the credentials committee. Both Stephan and the executive committee submitted written statements to Jones. After the hearing, Jones sent a report to Baylor's general counsel concurring with the decision of the executive committee and recommending that Stephan not be granted privileges at Baylor. Jones's stated reasons for his recommendation included: (1) the number of malpractice claims that had been made against Stephan; (2) the fact that two insurance companies did not renew Stephan's malpractice insurance policies because of claims against him; (3) documented medical complications in patients following surgical procedures at other hospitals that resulted in claims against Stephan and set-

tlements; (4) inaccurate information given by Stephan on his application for privileges at Baylor, including his failure to disclose he had, on one or more occasions, failed the American Board of Surgery Examination; and (5) Jones's opinion that Stephan's medical record documentation was, in many instances, below Baylor's standard.

The Baylor board of trustees denied Stephan's application for privileges. In a letter to Stephan dated June 21, 1993, Baylor's executive director stated the board's decision was based on the recommendations given by the credentials and executive committees and the information contained in Jones's report. The letter further notified Stephan that the denial of his application would be reported to the Texas State Board of Medical Examiners as required by the Health Care Quality Improvement Act.

Information regarding Stephan's denial of privileges was reported to the National Practitioner Data Bank as part of an "adverse action report." The report classified Stephan's denial of privileges as being due to "incompetence / malpractice / negligence." A notation on the report further stated: "evidence of quality of care and medical record documentation unacceptable to this hospital." Despite these reports, Stephan sought to reapply for privileges at Baylor on several occasions beginning in December 1993. According to Stephan, Baylor has continually refused to provide an application for him to use to reapply.

In April 1997, Stephan filed this suit against Baylor. Stephan's original petition set forth claims for breach of contract, fraud, unfair competition, tortious interference with contracts and prospective contracts, intentional infliction of emotional distress, defamation, defamation per se, business disparagement, and conspiracy. Stephan further sought a declaratory judgment that Baylor made its report to the Texas State Board of Medical Examiners in bad faith. In response, Baylor answered and filed a counterclaim for costs and attorneys fees alleging that Stephan's claims were frivolous, unreasonable, and filed in bad faith.

Baylor moved for summary judgment on all of Stephan's claims. It argued there was no cause of action for a denial of privileges by a private hospital and Baylor's peer review activities were protected by qualified immunity. Baylor also argued it had not breached any contractual obligation to Stephan, Stephan's tort claims were barred by the applicable statutes of limitations, and Baylor could not be liable for defamation because it never published any statements to the National Practitioner Data Bank. To the extent Stephan could show that Baylor published statements to the NPDB, Baylor contended the statements were protected by absolute immunity. Additionally, Baylor argued that there was no evidence to support Stephan's claims for breach of contract, fraud, unfair competition, intentional infliction of emotional distress, and civil conspiracy. The trial court granted Baylor's motion for summary judgment without stating its reasons and ordered Stephan take nothing by his suit. In the judgment, the trial court also stated that all other relief sought was denied. This appeal ensued.

II.

In his appellate brief, Stephan points to three allegedly wrongful acts committed by Baylor as the basis for his claims against the hospital. Those acts are: (1) Baylor's denial of his application for staff privileges; (2) its refusal to allow him to reapply; and (3) its publication of an allegedly false and defamatory report to the National Practitioner Data Bank. We first address Stephan's argument that the trial court erred in granting summary judgment in favor of Baylor because there are material questions of fact regarding Baylor's liability for wrongfully denying his application for staff privileges.

■ In making his argument that Baylor wrongfully denied him staff privileges, Stephan states he is not asking this Court to second guess the hospital's decision. Instead, he argues there are questions of fact about whether Baylor failed to comply with the "standards mandated by applicable law" in making its decision to deny him privileges. Stephan does not specify what "applicable law" he is relying on or what "standards" Baylor failed to meet that give rise to his causes of action. After a review of both the common and statutory law, we conclude there are presently no standards applicable to hospital staffing decisions that are enforceable by a private lawsuit.

■■ The longstanding common law in Texas has been that doctors generally have no cause of action against a private hospital for the denial or termination of staff privileges even where the action was arbitrary and capricious or where rights to due process have been violated. *See Tigua Gen. Hosp., Inc. v. Feuerberg*, 645 S.W.2d 575, 578 (Tex.App.-El Paso 1982, writ dism'd). This unfettered ability to make staffing decisions was statutorily limited by the Texas Legislature when it enacted a provision in the Texas Hospital Licensing Law requiring hospitals to afford procedural due process to each person applying for medical staff membership and privileges. *See* TEX. HEALTH & SAFETY CODE ANN. § 241.101 (Vernon 1992 & Supp. 2000). In addition, the legislature set forth guidelines in the Texas Medical Practice Act for hospitals that choose to adopt rules and regulations relating to qualifications for medical staff appointments. *See* Act of May 27, 1983, 68th Leg., R.S., ch. 552, 1983 Tex. Gen. Laws 3207, 3209 (repealed) (current version at TEX. OCC.CODE ANN. § 151.051 (Vernon Pamph.2000)). Under the Act, if a hospital adopts rules for staff appointments, they must be reasonable, without irrelevant considerations, and neither arbitrary nor capricious. *Id.* These statutes, although binding on hospitals, do not create a right of action in favor of physicians against hospitals that fail to comply. *See Cole v. Huntsville Mem'l Hosp.*, 920 S.W.2d 364, 372–73 (Tex.App.-Houston [1st Dist.] 1996, writ denied). Instead, enforcement is statutorily placed in the hands of the State and its agencies. A hospital's failure to provide procedural due process to physicians applying for privileges may be redressed solely through actions by the attorney general, the Texas Department of Health, or the commissioner of health. *See id.; see also* TEX. HEALTH & SAFETY CODE ANN. §§ 241.051–.059 (Vernon 1992 & Supp.2000). Through the State's actions, a hospital may be enjoined, subjected to civil or administrative penalties, or have its license revoked. *Id.* §§ 241.051–.059 A hospital may not, however, be held liable in damages to an individual physician for its failure to provide due process.

Similarly, the Texas Medical Practice Act, which contains the guidelines for medical staffing rules, includes a complex enforcement scheme. *See* TEX.REV.CIV. STAT. ANN. art. 4495b (repealed) (current version at TEX. OCC.CODE ANN. §§ 165.001–.160 (Vernon Pamph.2000)). This scheme does not afford physicians the ability to bring private actions against hospitals. *See Cole*, 920 S.W.2d at 372–73. The language of the Act makes the adoption of rules and regulations for medical staff appointments voluntary. *See* TEX.REV.CIV. STAT. ANN. art. 4495b § 1.02 (repealed) (current version at TEX. OCC.CODE ANN. § 151.051 (Vernon Pamph.2000). Creating a private right of action to enforce the guidelines would discourage hospitals from adopting rules and regulations with respect to staffing and defeat the purpose of the Act, which is to protect the public interest. *See* TEX. OCC. CODE ANN. § 151.003 (Vernon Pamph. 2000). Accordingly, we conclude that existing Texas law cannot form the basis of Stephan's claim that he is entitled to recover damages from Baylor because it violated mandated standards in making its decision to deny him staff privileges.

■ The only other potential source of standards for hospitals making medical

staff appointments is the federal Health Care Quality Improvement Act. *See* 42 U.S.C. §§ 11101–11152 (1995). The HCQIA sets out standards for medical professional review actions that, if followed, provide individuals and professional review bodies with immunity from liability for damages. *See id.* §§ 11111–11112. To obtain immunity, a professional review action must be taken:

> (1) in the reasonable belief that the action was in furtherance of quality health care,
>
> (2) after reasonable effort to obtain the facts of the matter,
>
> (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and
>
> (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts after meeting the requirement of paragraph (3).

*Id.* § 11112. It has been consistently held, however, that these standards, like the standards found in Texas law, do not provide a basis for a cause of action in favor of a physician against a hospital. *See Wayne v. Genesis Med. Ctr.*, 140 F.3d 1145, 1148 (8th Cir.1998); *Bok v. Mutual Assurance, Inc.*, 119 F.3d 927, 928–29 (11th Cir.1997). The HCQIA was intended to benefit the public by encouraging physicians to identify and discipline incompetent and unprofessional behavior. *See Wayne*, 140 F.3d at 1148. It was not intended to benefit physicians by providing them with the basis for a lawsuit against hospitals that attempt to achieve this end by implementing professional review procedures but fail to meet the enumerated standards. *See id.*

Because there are no privately enforceable standards relating to hospital staffing decisions, Stephan has no right to recover against Baylor for denying him staff privileges based on Baylor's alleged failure to comply with any such standards. To the extent Stephan's claims are based on Bay-

lor's refusal to grant him staff privileges or the violation of any standards in doing so, the trial court correctly granted summary judgment in favor of Baylor.

■ The second wrongful act alleged by Stephan purportedly forms the basis of his claim for breach of contract. Stephan contends that Baylor refused to allow him to reapply for privileges even though it was contractually obligated to permit him to do so 180 days after it denied his original application. According to Stephan, this contractual obligation arose out of the operating bylaws approved and adopted by Baylor's medical staff and board of directors.

At the time Stephan was applying for privileges at Baylor, the hospital had in place various bylaws regulating hospital procedures. The bylaws addressing appointments to the medical staff, including the application process, were part of Baylor's medical staff bylaws. Reapplications after an adverse decision were governed by bylaw 5.4–9, which stated:

> An applicant who has received a final adverse decision regarding appointment shall not be eligible to reapply to the medical staff for a period of one hundred-eighty (180) days. Any such reapplication shall be processed as an initial application, and the applicant shall submit such additional information as the staff or the board may require in demonstration that the basis for the earlier adverse action no longer exists.

Because Baylor has refused to provide him with a new application, Stephan contends it breached its "contractual obligation" under bylaw 5.4–9.

■ Procedural rights established in hospital bylaws can constitute contractual rights. *See Gonzalez v. San Jacinto Methodist Hosp.*, 880 S.W.2d 436, 438 (Tex.App.-Texarkana 1994, writ denied). But rights created by *medical staff* bylaws are not necessarily binding on a hospital. *See id.; see also Weary v. Baylor Univ.*

*Hosp.,* 360 S.W.2d 895, 897 (Tex.Civ.App.-Waco 1962, writ ref'd n.r.e.). The medical staff and the hospital, although related, are not one and the same. The medical staff generally consists of the physicians and other medical personnel. The hospital is an entity governed by its board of directors. Here, the preamble to Baylor's medical staff bylaws recognizes that the staff "is subject to the ultimate authority of the board." The medical staff bylaws do not attempt to define or limit Baylor's power to act through its board of trustees. Bylaws that do not define or limit the power of a hospital as it acts through its governing board do not create contractual obligations for the hospital. *See Weary,* 360 S.W.2d at 897. This is true despite the fact that the board may have approved and adopted the staff bylaws. *Id.*

Stephan argues that the reference to the board of directors in bylaw 5.4–9 makes the bylaw binding upon the hospital and imposes a duty on it to supply him with an application to reapply. We disagree. Nothing in bylaw 5.4–9 suggests that it is intended to place any sort of duty on the board with respect to reapplications. Mere references to a hospital board in staff bylaws do not automatically create obligations binding on the hospital.

Furthermore, we see nothing in the bylaw that gives a physician a right to reapply. Bylaw 5.4–9 specifically states that reapplications will be processed in the same manner as initial applications. Requests for initial applications may be refused under medical staff bylaw 5.2–1, and it follows, therefore, that requests to reapply may be refused as well. Bylaw 5.4–9 does not create a contractual right to reapply that is enforceable against the hospital. The trial court correctly granted Baylor summary judgment on Stephan's contract claim and all claims that may be based on Baylor's refusal to allow Stephan to reapply.

The third and last wrongful act alleged by Stephan is Baylor's creation of a purportedly false and defamatory adverse action report that was sent to the National Practitioner Data Bank. The report stated that Stephan was denied privileges at Baylor due to "incompetence / malpractice / negligence." The report further noted that the denial was based on "evidence of quality of care and medical record documentation unacceptable to this hospital." Baylor moved for summary judgment on all claims relating to the report on three separate grounds: statute of limitations, absolute immunity, and no publication by Baylor to the NPDB. We conclude Baylor did not show itself entitled to summary judgment on any of these grounds.

Adverse action reports are mandated by the federal Health Care Quality Improvement Act. Under the HCQIA, a health care entity must report to the state board of medical examiners any professional review action that adversely affects the clinical privileges of a physician. *See* 42 U.S.C. § 11133(a)(1) (1995). This information is then forwarded by the state board to the NPDB. *See id.* § 11133(b). Upon request, the NPDB must provide the adverse action information it receives to state licensing boards, hospitals, and other organizations that have entered into, or may be entering into, an employment or affiliation relationship with the subject physician or to which the physician has applied for clinical privileges or appointment to the staff. *Id.* § 11137(a). The HCQIA requires this information be kept confidential by the recipient, and any breach of confidentiality is subject to a civil monetary penalty. *Id.* § 11137(b).

■ Baylor argues that the statute of limitations bars Stephan's defamation and defamation related claims because he filed his suit more than three years after the adverse action report was sent to the NPDB. Stephan responds that because the report continues to be disseminated by the NPDB, a new cause of action, together with a new limitations period, arises each time the NPDB transmits the report. Whether the statute of limitations bars Stephan's claims depends upon whether

the "single publication rule" applies to a report initially sent to the NPDB.

■■■■ The single publication rule has been adopted in cases of alleged libel in mass media. *See Williamson v. New Times, Inc.,* 980 S.W.2d 706, 710 (Tex. App.-Fort Worth 1998, no pet.); *Holloway v. Butler,* 662 S.W.2d 688, 692 (Tex.App.-Houston [14th Dist.] 1983, writ ref'd n.r.e.). Under the rule, a plaintiff's cause of action accrues on the last day of the mass distribution of the printed matter containing the defamatory statement. *Holloway,* 662 S.W.2d at 692. On that date, the publisher of the statement has made the libelous matter available to his intended audience and the tort is complete. By setting a single accrual date for claims of mass media libel, the rule prevents continually extended limitations periods based upon retail sales or secondary distributions of the printed matter.

■■■■ The single publication rule is limited in its application, however. The rule does not apply to separate printings of the same publication or to situations in which the same information appears in different publications. *Id.* Under those circumstances, it is apparent that the publisher intends to reach different audiences and this intention justifies a new cause of action. *See Hertzberg v. Wurzbach,* 266 S.W. 190, 191 (Tex.Civ.App.-San Antonio 1924, no writ); *cf. Schneider v. United Airlines, Inc.,* 208 Cal.App.3d 71, 256 Cal. Rptr. 71, 76 (1989). In *Hyde v. Hibernia National Bank,* the Fifth Circuit Court of Appeals applied the "new audience" rationale to conclude the single publication rule did not apply to credit reports. *Hyde v. Hibernia Nat'l Bank,* 861 F.2d 446, 450 (5th. Cir.1988). The court held that each transmission of a credit report to a new audience resulted in a separate and distinct injury to which a separate statute of limitations applied. *Id.* We conclude the same reasoning applies to adverse action reports made to the NPDB and then disseminated by it.

Although the adverse action information provided by Baylor is contained in a single report made available to a wide audience through the NPDB, the confidential nature and restricted dissemination of the report means it necessarily reaches a separate and discrete audience with each dissemination by the NPDB. *See* 42 U.S.C. § 11137(b) (1995). There is no "mass publication" as contemplated by the single publication rule. A physician may suffer a new and distinct injury with each republication of an allegedly defamatory report by the NPDB. Accordingly, each transmission of the report is a new publication and a possible separate tort.

■■■■ Baylor argues that the single publication rule should apply to it because once it made its report, it "relinquished all right of control, title, and interest in the printed matter." *See Holloway,* 662 S.W.2d at 692. It is clear the NPDB released the report at its discretion to others and not at Baylor's direction. Baylor made its report, however, with full knowledge of· how the information would be used and potentially disseminated by the NPDB. Although the general rule is that one is not liable for repetition of a defamatory statement by a third person, if a reasonable person would recognize that his actions create an unreasonable risk that the defamatory matter will be communicated to other parties, his conduct becomes a negligent publication to those parties with the same consequences as a direct and intentional communication. *Cf. First State Bank v. Ake,* 606 S.W.2d 696, 701 (Tex.Civ.App.-Corpus Christi 1980, writ ref'd n.r.e.); *S.H. Kress & Co. v. Lindley,* 46 S.W.2d 379, 381 (Tex.Civ.App.-El Paso 1932, no writ).

Here, the risk that the allegedly defamatory report would be communicated to others was almost certain. Baylor was aware by virtue of the HCQIA that its adverse action report would be sent by the Texas Board of Medical Examiners to the NPDB and, from there, the information contained in the report would be transmitted to any

authorized person requesting it. Baylor presented no summary judgment evidence that the allegedly defamatory report was not disseminated by the NPDB after the expiration of the limitations period that it urged the trial court to apply. Accordingly, Baylor was not entitled to summary judgment on Stephan's defamation claims on the asserted ground of application of the statute of limitations.

Baylor's argument that the statements in the adverse action report are protected by absolute immunity is equally unavailing. Baylor contends it cannot be held liable for making the allegedly defamatory statements because they were made to governmental entities serving a quasi-judicial function. The general rule is that communications made in the course of judicial or quasi-judicial proceedings are protected by an absolute privilege. *See James v. Brown,* 637 S.W.2d 914, 916 (Tex.1982); *Attaya v. Shoukfeh,* 962 S.W.2d 237, 238–39 (Tex.App.-Amarillo 1998, pet. denied). The privilege attaches to the *proceeding,* however, and not to the parties involved in the communication. *See Gallegos v. Escalon,* 993 S.W.2d 422, 424 (Tex.App.-Corpus Christi 1999, no pet.). The privilege was created to allow citizens to seek redress and to encourage witnesses to testify by allaying their fear of being sued by those made the subject of the proceeding. *Attaya,* 962 S.W.2d at 239.

In this case, the adverse action report was not sent to the Texas Board of Medical Examiners or the NPDB as a part of a judicial or quasi-judicial proceeding. Neither the Board nor the NPDB was called upon to investigate, exercise judgment, or impose penalties with respect to Stephan's denial of privileges. The filing, forwarding, and distribution of the adverse action report were simply administrative functions carried out by virtue of federal law. *See* 42 U.S.C. §§ 11133, 11137 (1995). Administrative functions are not

entitled to immunity even when performed by those who have judicial or quasi-judicial powers. *See Oden v. Reader,* 935 S.W.2d 470, 475–76 (Tex.App.-Tyler 1996, no writ) (prosecutor not entitled to absolute immunity for statements made as part of administrative duties rather than quasi-judicial duties). Because the report was not made as part of a protected proceeding, Baylor was not entitled to summary judgment on the ground of absolute immunity.

Finally, Baylor contends it is not liable for statements made to the NPDB because it sent the adverse action report only to the Texas Board of Medical Examiners. This argument fails for the reasons stated in our above discussion about foreseeable republication. Parties who reasonably foresee that their defamatory statements will be repeated to third parties may be held responsible for republications. *Cf. First State Bank,* 606 S.W.2d at 701; *Lindley,* 46 S.W.2d at 381. Baylor knew by virtue of the applicable statutory law that its statements to the Texas Board of Medical Examiners would be forwarded to the NPDB. Accordingly, Baylor may be held liable in the same manner as if it had directly published the adverse action report to the NPDB. Baylor has not shown that Stephan's claims based on the allegedly defamatory report fail as a matter of law.

In addition to its request for a traditional summary judgment, Baylor also requested a "no evidence" summary judgment on Stephan's claims for breach of contract, fraud, unfair competition, tortious interference, intentional infliction of emotional distress, and civil conspiracy. *Cf.* Tex.R. Civ. P. 166a(c), (i). It is unnecessary for us to discuss the propriety of a no evidence summary judgment on Stephan's claims for breach of contract and fraud because the allegations in Stephan's petition clearly connect those claims solely to Stephan's denied application for privileges and Baylor's refusal to allow him to reapply.[1] We have already concluded that Ste-

---

1. In addition, Stephan stated in his response

to the motion for summary judgment, as well

phan has no right to pursue either of those actions. The allegations in the petition supporting the remaining claims are more broadly worded, however. To the extent the remaining claims may be based on Baylor's publication of the allegedly defamatory adverse action report, we must determine whether Stephan produced more than a scintilla of evidence in response to Baylor's motion.

 In reviewing a no evidence summary judgment, we apply the same legal sufficiency standard as we apply in reviewing directed verdicts. *Moore v. K Mart Corp.,* 981 S.W.2d 266, 269 (Tex. App.-San Antonio 1998, pet. denied). We review the evidence in the light most favorable to the respondent and disregard all contrary evidence and inferences. *See id.* If the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact, a no evidence summary judgment is improper. *Id.*

 In its motion, Baylor stated there was no evidence to support any of the essential elements of Stephan's claims for unfair competition or conspiracy. In response, Stephan stated the record contained evidence that physicians at Baylor acted in concert to wrongfully deny him staff privileges. Stephan's evidence, however, relates solely to Baylor's denial of privileges to Stephan, an action for which he has no right to recover. Stephan does not point to any evidence connecting his claims for conspiracy and unfair competition to Baylor's publication of the adverse action report, the only action asserted for which he may possibly recover. Because Stephan failed to present any probative evidence to raise a genuine issue of material fact on his claims for conspiracy and unfair competition, the trial court properly granted Baylor's request for a no evidence summary judgment on those claims.

 In response to Baylor's request for a no evidence summary judgment on the claims for tortious interference, Stephan points to evidence relating to both Baylor's denial of privileges and its publication of the purportedly defamatory report. As discussed above, evidence relating to the denial of privileges is insufficient to raise a genuine issue of material fact. With respect to the publication of the adverse action report, Stephan presented testimony showing generally that "a negative NPDB report is viewed negatively by managed care plans and can make it difficult for a physician to gain entry to plans."

 To prove a claim for tortious interference with contractual relations or prospective contractual relations, a party must show there was an existing contract subject to interference or, for the latter, a reasonable probability that a contractual relationship would have been created. *See Holloway v. Skinner,* 898 S.W.2d 793, 795–96 (Tex.1995); *Garner v. Corpus Christi Nat'l Bank,* 944 S.W.2d 469, 477 (Tex. App.-Corpus Christi 1997, writ denied). The party must also show actual damage or loss occurred as a result of the alleged interference. *Holloway,* 898 S.W.2d at 795–96; *Garner,* 944 S.W.2d at 477. Although the summary judgment record contains statements about the general effect of negative NPDB reports, Stephan points to no summary judgment evidence of any contracts or prospective contracts that were interfered with or damaged in any way as a result of Baylor's publication of the adverse action report. Baylor was entitled, therefore, to a no evidence summary judgment on Stephan's claims for tortious interference.

 Finally, Baylor requested summary judgment on Stephan's claim for intentional infliction of emotional distress. Baylor simply contends there was no evidence that the statements made in the

as on appeal, that he had insufficient evidence to support his fraud claim and was withdraw- ing it.

adverse action report were false or defamatory in nature. We note Baylor did not assert that the adverse action report was "true" as part of its request for a traditional summary judgment on Stephan's defamation claims in general. The only grounds upon which Baylor sought summary judgment on Stephan's claims for defamation, defamation per se, and business disparagement were the statute of limitations, absolute immunity, and lack of publication, which we discussed above. Baylor could not properly obtain a traditional summary judgment on a ground not specified. *See McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993). Baylor's argument that the report was "true" was made solely in support of its request for a no evidence summary judgment on Stephan's claim for intentional infliction for emotional distress. Our analysis of the merits of the argument, therefore, necessarily focuses only on the propriety of the trial court's decision to grant a no evidence summary judgment on Stephan's claim for intentional infliction of emotional distress.

■■■ Absent a false and defamatory statement, Baylor's conduct in publishing the report could not be extreme or outrageous as required for an intentional infliction of emotional distress claim. *See Twyman v. Twyman*, 855 S.W.2d 619, 621–22 (Tex.1993). The only summary judgment evidence presented by Stephan to show the information in the adverse action report was false was Stephan's own deposition testimony in which he concluded the report did not accurately reflect the findings made by Baylor during the application and peer review process.

■■■ In determining whether an adverse action report is true, we examine only whether the report accurately reflects the reasons for the adverse action, not whether the reasons themselves were accurate or true. *See Davis v. Methodist Hosp.*, 997 S.W.2d 788, 794 n. 3 (Tex.App.-Houston [1st Dist.] 1999, pet. denied). Adverse action reports are intended to inform others who may become associated with the subject physician of conclusions reached and decisions made as a result of peer review proceedings. The reports are not intended to validate or justify those decisions and conclusions, nor do they purport to legitimize the peer review process that may have been used. The report merely states the actions and opinions of the makers of the report. Accordingly, in this case we must determine whether the adverse action report accurately reflects Baylor's actions and opinions with respect to Stephan, that is, whether the report reflects that Stephan was denied staff privileges at Baylor because the hospital concluded Stephan was incompetent, negligent, or guilty of malpractice. Whether Stephan was actually incompetent, negligent, or guilty of malpractice is irrelevant to our determination. *See id.*

The summary judgment evidence shows the Baylor board of trustees denied Stephan's application for staff privileges based on the recommendations of the credentials and executive committees and the findings in the hearing report created as a result of Stephan's challenge to the recommendations. The hearing report included findings of an increased risk to the hospital from the number of malpractice claims filed against Stephan, below-standard medical record documentation by Stephan, and inaccurate information on Stephan's application for privileges. These findings correspond to the hospital's stated conclusion that Stephan was at least incompetent or negligent, if not actually guilty of malpractice. Accordingly, the report's classification of Baylor's denial of privileges to Stephan as being due to "incompetence / negligence / malpractice" was an accurate recitation of Baylor's reasons. *See id.* at 795. Baylor also clarified the adverse action report by stating specific grounds for its denial in a notation. The notation stated: "evidence of quality of care and medical record documentation unacceptable to this hospital." To the extent the broad classification in the report could be mis-

leading, the notation narrows the basis for the denial by stating the findings actually made by Baylor. The summary judgment evidence demonstrates, therefore, that the adverse action report was not false, but was an accurate recitation of Baylor's findings and conclusions. Accordingly, we conclude the trial court correctly granted Baylor's request for a no evidence summary judgment on Stephan's claim for intentional infliction of emotional distress.

As a collateral issue, Stephan challenges the trial court's discovery order denying his motion to compel answers to interrogatories and the production of documents. The evidence sought by Stephan concerned the peer review and credentialing process used at Baylor generally, as well as in Stephan's case in particular. In response to the discovery requests, Baylor asserted that the information and documents were privileged. Stephan claims that, to the extent any of the evidence may have been privileged, Baylor waived its privilege under the "offensive use doctrine" when it filed its counterclaim asserting Stephan's suit was frivolous and brought in bad faith.

 Under the offensive use doctrine, a party may waive a privilege applicable to evidence by seeking affirmative relief on a claim for which the privileged information is outcome determinative. See *Republic Ins. Co. v. Davis*, 856 S.W.2d 158, 163 (Tex.1993). Stephan argues the withheld evidence relates to the merits of his claim that Baylor improperly used its peer review and credentialing process to wrongfully deny him privileges and, therefore, is outcome determinative of Baylor's counterclaim that his suit is frivolous. First, we note the trial court denied the relief requested in Baylor's counterclaim without the evidence sought by Stephan. In its judgment, the court denied all relief sought by either party other than that sought in Baylor's motion for summary judgment. Second, Stephan has no right as a matter of law to recover for a "wrongful" denial of privileges. Thus, evidence possibly relevant to that claim could not

have impacted the outcome of Baylor's counterclaim, and Baylor did not waive any privilege with respect to that information under the offensive use doctrine.

 Stephan additionally states the withheld evidence would reveal the falsity of the adverse action report by showing "there was no basis for a statement that Dr. Stephan was guilty of 'incompetence / malpractice / negligence.'" As stated above, whether Stephan was actually negligent, incompetent, or guilty of malpractice has no bearing on the analysis of the truth or falsity of the adverse action report. The only relevant determination is whether the report accurately reflected Baylor's reasons for denying him privileges. Accordingly, the information sought by Stephan would have no bearing on his claim for intentional infliction of emotional distress or, consequently, on Baylor's assertion that his claim was frivolous.

We have concluded, however, that Baylor did not show itself to be entitled to summary judgment on Stephan's other claims relating to the adverse action report, that is, his defamation, defamation per se, and business disparagement claims as well as his request for a declaratory judgment. Those claims we will return to the trial court for further proceedings. In light of our disposition of those claims, the denial of Stephan's motion to compel evidence relating to the surviving claims will be interlocutory, and we need not address at this time the trial court's order as it may relate to those claims.

Based on the foregoing, we affirm the trial court's summary judgment against Stephan with respect to any claim asserted for denial of staff privileges. We also affirm the trial court's summary judgment with respect to Stephan's claims for breach of contract, fraud, unfair competition, tortious interference with contracts and prospective contracts, intentional infliction of emotional distress, and conspiracy as well as the trial court's order denying Stephan's motion to compel to the extent it

relates to evidence sought on those claims. We reverse the trial court's summary judgment with respect to the remaining claims and remand them for further proceedings.