**Tuong B. VAN, M.D., Plaintiff,**

v.

**Allan ANDERSON, M.D., Jack Schwade, M.D., and Medical City of Dallas Hospital, Defendants.**

**No. CIV.A. 3:99CV0311P.**

United States District Court,
N.D. Texas,
Dallas Division.

March 7, 2002.

552

David William Townend, Brown Brown Chandler & Townend, Garland, TX, for Tuong B Van, Nhan Bui Nguyen, Ho Kuy Khac.

Dawn Ryan Budner, Sherri Turner Alexander, Gregory P. Supan, Stephanie S. Glickman, Bell Nunnally & Martin, Dallas, TX, for Allan Anderson, Jack Schwade, Medical City Dallas Hosp.

Harland A. Martin, Dallas, TX, pro se.

## MEMORANDUM OPINION AND ORDER

SOLIS, District Judge.

Now before the Court are the following:

1. Defendants' Motion for Summary Judgment, with brief in support and appendix, filed June 15, 2001;

2. Plaintiff's Consolidated Response with Supporting Brief to Defendants' Motion for Summary Judgment, and appendix, filed July 12, 2001;

3. Defendants' Reply on Motion for Summary Judgment and Brief in Support, with appendix, filed on July 27, 2001;

4. Defendants' Motion to Strike Evidence in Connection with Plaintiff's Consolidated Response to Defendants' Motion for Summary Judgment and Brief in Support Thereof, with appendix, filed July 27, 2001;

5. Plaintiff's Response to Defendants' Motion to Strike Affidavit of Tuong B. Van, M.D., with Supporting Brief, filed August 6, 2001;

6. Defendants' Reply to Plaintiff's Response to Motion to Strike Evidence in Connection with Plaintiff's Consolidated Response to Defendants' Motion for Summary Judgment, and Brief in Support Thereof, filed August 20, 2001;

7. Plaintiff's Emergency Motion to Reopen Discovery and to Supplement the Witness List with Supporting Brief, filed January 8, 2002; and

8. Defendants' Response to Plaintiff's Emergency Motion to Reopen Discovery and to Supplement the Witness List and Brief in Support Thereof, filed January 11, 2002.

After a thorough review of the summary judgment evidence, the pleadings, the parties' briefs, and the applicable law, for the reasons set forth below, the Court is of the opinion that Defendant's Motion for Summary Judgment should be GRANTED. Further, the Court finds that Defendants' Motion to Strike Evidence in Connection with Plaintiff's Consolidated Response should be GRANTED in PART and DENIED in PART, with remaining parts DENIED as MOOT,[1] and Plaintiff's Emergency Motion to Reopen Discovery and to Supplement the Witness List should be DENIED.

---

1. Defendants' Motion to Strike objects to Dr. Van's affidavit, attached to the Plaintiff's Consolidated Response, on a wide variety of evidentiary grounds. Because the Court has found it unnecessary to rely upon the great majority of the challenged testimony, it need not consider each of the Defendants' objec-

## BACKGROUND

Plaintiff Tuong B. Van, M.D., brings the current lawsuit before the Court against Medical City Dallas Hospital (hereinafter "Hospital"), and Doctors Allan Anderson and Jack Schwade, asserting claims of race and/or national origin under 42 U.S.C. § 1981. *See* Pl.'s Orig. Compl. at 7–9. Plaintiff's suit also includes additional claims against the Hospital for breach of contract and declaratory judgment, and allegations of defamation and interference with contractual relations against Defendants Anderson and Schwade. Id. at 9–11.

Dr. Van, who is an individual of Vietnamese ethnicity and origin, obtained his medical doctorate degree from the University of Texas School of Medicine at San Antonio in 1985. *See* Pl.'s Consolidated Resp. at 2 and Exh. A (hereinafter "Pl.'s Resp."). His post-graduate training included a general surgery residency from July 1985 through June 1986 at the University of Texas Health Science Center at San Antonio; a three year residency in internal medicine at Tulane University Medical Center in New Orleans, Louisiana, from July 1987 to June 1990; a one year fellowship in echocardiography at the University of Alabama Medical Center in Birmingham, Alabama from July 1991 to June 1992; and a fellowship in cardiology from July 1992 to June 1994 at the Louisiana State Medical Center in Shreveport, Louisiana. *See* Id. Shortly after returning to Texas, Dr. Van was appointed to the Medical Staff of the Hospital in August of 1994, where he obtained privileges to perform invasive cardiology procedures, including the performance of cardiac catheterizations.[2] *See* Id. at 3; *see also* Defs.' Br.

Supp. Mot. Summ. J. at 7 (hereinafter "Defs.'s Br.").

According to Dr. Van, between the period of 1994 through late 1997, no concerns were ever raised to him regarding his medical practice at the Hospital. *See* Pl.'s Resp. at 3. However, on or about January 1, 1998, nurses at the Hospital filed an occurrence report against Plaintiff, alleging that he had been difficult with them when they had called on him to determine when he was going discharge a certain patient. *See* Defs.' Br. at 7; *see also* Defs.' App. Supp. Defs.' Mot. Summ. J. at 535–539 (hereinafter "Defs.' App."). Following this complaint, Dr. Allan Anderson, the then Chief of the Cardiology Section at the Hospital, had a telephone conversation with Plaintiff in early February 1998, to discuss this occurrence report. *See* Defs.'s App. at 1492 (Anderson Dep. at 13). During this conversation, however, Dr. Van asserts that Dr. Anderson made a race-based threat to him in which he had stated that: "he [Dr. Anderson] had been receiving (sic) a complaint from one or more of the nurses regarding [Plaintiff's] Oriental patients and that if [Plaintiff] did not take some unspecified action about [his] Oriental patients [Plaintiff] would be peer reviewed." Pl.'s Resp., Exh. B at 2 (Van Aff. at 2). When asked to clarify the problem, Plaintiff states that Dr. Anderson abruptly terminated their telephone conversation. *See* Id. Dr. Anderson, meanwhile, denies ever making such a statement to Dr. Van. *See* Defs.'s App. at 1495 (Anderson Dep. at 16).

Following this incident, Dr. Van alleges he interpreted this threat by Dr. Anderson to mean that he needed to reduce the

---

tions. Instead, insofar as it may be necessary, this Order will address specific objections to those portions of the disputed evidence that the Court regards as relevant to the resolution of particular summary judgment issues. The

remaining portions of Defendants' objections will be DENIED as MOOT.

2. Also known as "angiograms" cardiac catheterizations are the studies of the coronary arteries. *See* Pl.'s Resp. at 3.

number of his Asian patients at the Hospital, or face a peer review (and the possible removal of his privileges).[3] *See* Pl.'s Resp., Exh. B at 3 (Van Aff. at 3). Thereafter, Plaintiff asserts that he "drastically reduc[ed] the number of [his] Asian patient admissions to the hospital; call[ed] in consultants wherever possible to provide back-up on cases, and referr[ed] as many cases out to other cardiologists." Id. Dr. Van estimates that by late 1997 he was admitting as many as 20 to 30 patients to the hospital each month (a majority of whom were Asian), and was performing an average of 50 to 75 angiograms per year. Id. Dr. Van also estimates that by 1998, he had reduced his practice at the Hospital by at least 50%, and again in 1999 by an additional 50%, leaving his total practice by end of August of 2000 to probably less than 10% of what it had been in December of 1997. Id.

Sometime later, in early 1998, Dr. Allan Schwade, the Chairman of the Cardiology Performance Improvement Committee ("CPIC" or "Performance Committee"), received a complaint from a fellow cardiologist at the Hospital, Dr. David Brown, concerning the number of catheterizations which had been performed on a particular patient treated by Dr. Van. *See* Defs.' App. at 1296, 1301–1302 (Schwade Dep. at 14, 19–20). As a result of this complaint, which was brought to the attention of the Performance Committee by Dr. Schwade, a targeted review was initiated on Plaintiff's cases for the next six months. *See* Defs.' Br. at 8. At about this same time, in April of 1998, Dr. Van submitted an application for reappointment to the medical staff of the Hospital. *See* Id. at 8–9. This reappointment was ultimately granted by the Board of Trustees on June 1, 1998, for a period of two years, subject to the outcome of the pending focus review.

Meanwhile, a second occurrence report was filed by the nursing staff against the Plaintiff on or about July 5, 1998. *See* Id. at 9; *see also* Defs.' App. at 541–544. This time the nursing staff complained that, among other things, Plaintiff had become loud and angry when he was informed that his desire to move a patient was against Hospital Policy. *See* Id.[4]

Subsequently, in September 1998, Dr. Van received a letter from Stephen Cor-

---

**3.** Plaintiff here also alleges that following his telephone conversation with Dr. Anderson, he reported this incident to two interventionalists who worked with him at the Hospital, Drs. Richard Snyder and Jeffrey Gladden. *See* Pl.'s Resp., Exh. B at 3 (Van Aff. at 3). According to Plaintiff, "Dr. Snyder commented that Dr. Anderson was a racist, and Dr. Gladden recommended that I should 'lay low,' which meant to reduce the number of my Asian patients at the Hospital." Id. The Court, however, shall strike these statements as they are clearly hearsay and are inappropriate for use at this summary judgment stage.

**4.** The Court notes here that the Plaintiff's Complaint alleges that throughout 1998, he was under constant harassment at the Hospital. More specifically, Dr. Van asserts having had several run-ins with the Hospital's nursing staff, including problems over calling on him to serve as a translator for his patients.

*See* Pl.'s Orig. Compl. at 4. Plaintiff also cites as an example of this harassment an occasion when he tried to order the transfer of a Vietnamese patient from Lake Pointe Medical Center to the telemetry unit of Defendant Hospital, but was falsely informed by hospital personnel that he had to discharge one of his Vietnamese patients from the telemetry unit because there were no beds available (though Plaintiff asserts there were at least eight beds available). *See* Id. Nevertheless, as demonstrated by the voluminous summary judgment evidence provided to the Court by the Defendants, Plaintiff has admitted that (1) the patient he desired to transfer was in fact transferred to the Hospital on the same day as he requested, (2) the only person he spoke to was someone in "admitting," and (3) he never talked to the nurse in charge regarding this, or (4) that beds could be reserved for patients in the Hospital awaiting procedures. *See* Defs.' App. at 1086–1095.

beil, President and CEO of the Hospital, notifying him that, based on a report submitted by the CPIC, the Executive Committee of the Hospital, as well as the Privileges & Credentials Committee, had recommended that his application for reappointment to the medical staff be denied. *See* Pl.'s Resp., Exh. B at 5 (Van Aff. at 5 and Aff. Exh. B.).[5] Plaintiff timely requested a hearing, which was commenced on April 7, 1999. *See* Id.[6]

At this hearing, Plaintiff asserts that Dr. Schwade testified to the Committee re-garding the CPIC report and its attachments, which as he understood it, was the basis for both the Executive Committee and the Credentials Committee's adverse recommendations against him. *See* Id. Defendants now agree with Plaintiff that the CPIC report, which had been prepared by the Director of Quality Assurance at the Hospital, Ms. Mary Lou Bernhagen, contained a number of mistakes regarding medical facts in some of the underlying cases included in the report. *See* Id. at 7–13 (Van Aff. at 6–12); *see also* Defs.' Br. at 9, 12.[7]

5. Plaintiff also alleges that after receiving the CPIC report, he showed it to Dr. Snyder, a member of the CPIC, who informed him that the report was "b___ s___" and that he believed it was a witch hunt by Dr. Anderson, who was a "racist SOB." *See* Pl.'s Resp., Exh. B at 3 (Van Aff. at 3). Because this statement is clearly hearsay and improper summary judgment evidence, the Court shall strike it from the evidence.

6. Before this hearing, however, believing that the Hospital had refused to take any action against Drs. Anderson and Schwade for their alleged race-based threats, and for what Plaintiff believed was the adoption of a bogus peer review against him, Dr. Van filed this suit in federal court on February 12, 1999. *See* Pl.'s Resp., Exh. B at 15 (Van Aff. at 15); *see also* Pl.'s Orig. Compl.

7. According to Plaintiff, these errors in the CPIC report and Dr. Schwade's testimony included:
 a) In Case No. 472461 an excessive number of cardiac catheterizations caused an unnecessary iliac injury. Dr. Schwade admitted during question that an iliac artery embolism can occur after one cardiac catheterization;
 b) In Case No. 472461, that [Plaintiff] had caused an inappropriate and unnecessary transfer of a [patient]. Dr. Schwade conceded that another physician had recommended the transfer of the patient because she needed a bypass surgeon on standby for a procedure and one could not be found;
 c) In Case No. 633976 five cardiac catheterizations were done, the last two of which were unnecessary. Dr. Schwade conceded that only a total of three cardiac catheterizations were done;
 d) In Case No. 587795 [Plaintiff] was criticized for doing a transesophageal echocardiogram which was normal after a persantine thallium test was interpreted as normal on a seventeen year old male. In fact these tests were abnormal and were performed on a sixty year old not a seventeen year old male;
 e) In Case No. 651924 the report and Dr. Schwade's testimony falsely criticized [Plaintiff] for ordering an emergency cardiac catheterization on a patient who denied chest pain. The medical records in fact document that the patient did complain of severe chest pain, and the cath was not done emergently;
 f) In Case No. 652165 [Plaintiff] was criticized for performing an unnecessary cardiac catheterization on a twenty-eight year old male who had complained of side pain from broken ribs after a normal thallium stress and transesophageal echocardiogram. The report and the testimony was false because the patient did not have side pain from a broken rib, as chest films establish that there were no rib fractures and the cardiac catheterization was only performed after an abnormal thallium stress test;
 g) In Case No. 634111 there was an attempted intubation on two occasions with the TEE probe with the patient doubled over. This was false because the patient was successfully intubated and [Plaintiff] had no difficulty in intubating patients;
 h) That two incident reports existed in Case No. 651924 and Case No. 622364 which were adverse to [Plaintiff] when in fact no

After the Plaintiff identified some of these errors, the Hearing Committee recessed at 10:30 p.m. on April 7, 1999, and the hearing was not continued further. *See* Id. at 12. Dr. Van asserts that, in what he believes was a violation of the Hospital's bylaws, the Executive Committee later withdrew its recommendation against him, which resulted in the hearing panel being "unlawfully disbanded." *See* Pl.'s Resp., Exh. B. at 13 (Van Aff. at 13).[8] Plaintiff also alleges that prior to the commencement of the 1999 hearing, in December 1998, Dr. Anderson again repeated a racist threat against him, this time stating that "because [Plaintiff] had not listened to him and not done more about [his] Oriental patients, that it would now have a detrimental effect upon [his] career." Id. at 14 (Van Aff. at 14).

Thereafter, by letter dated June 25, 1999, Dr. Wayne Taylor, Chief of Staff for 1999, notified Dr. Van that the report from the Cardiology Section's Target Review Committee had been revised by Dr. Schwade, to correct any inadequate information which had been noted by Plaintiff at the hearing. *See* Defs.' App. at 70. This letter also advised Dr. Van that the revised report was being forwarded to a newly appointed Ad Hoc Departmental Investigation Committee, and that an outside expert cardiologist had been retained as a resource physician for the Committee, to investigate Plaintiff's cases. *See* Id. This Ad Hoc Committee, chaired by Dr. Peter Stack, was also provided with Plaintiff's medical charts, the hearing transcript from the April 7, 1999 hearing, as well as numerous additional records which the Plaintiff himself provided from his office practice upon the Committee's request. *See* Defs.'s Br. at 14; *see also* Pl.'s Resp., Exh. B. at 15 (Van Aff. at 15).

Later, after evaluating the aforementioned information during its investigation, the Ad Hoc Committee sent a letter to Dr. Van, dated January 19, 2000, advising him that Dr. David Hillis had been retained as an outside expert cardiologist, and listing a number of charts about which the Committee had some questions about. *See* Defs.' App. at 453. Plaintiff subsequently appeared before the Ad Hoc Committee on February 8, 2000, and was permitted to address the different charts which were the subject of the review. *See* Defs.' Br. at 14; *see also generally* Defs.' App. at 78–252 (Transcript of Interview).

A unanimous Ad Hoc Committee issued its final report on March 6, 2000, wherein they stated that "the overall theme after reviewing these records and interviewing Dr. Van is that his medical judgment is inadequate to properly practice cardiology within the standard of care at Medical City

---

incident reports existed in the [these cases]; and

i) In Case No. 618269 the report contended that all studies showed non-significant disease implying that the studies were unnecessary which is false because the interventionalist, Dr. Gladden, and [Plaintiff] interpreted a lesion in the LAD as having significant stenosis.

*See* Pl.'s Resp., Exh. B. at 4–6 (Van Aff. at 4–6).

**8.** Plaintiff also asserts here that, because the hearing panel was disbanded, he was never permitted to call witnesses on his behalf or was able to present his side of the case, including the testimony of his expert witnesses, Drs. Snyder and Gladden, who would have testified that he had managed his cases within the standard of care. *See* Pl.'s Resp., Exh. B at 13 (Van Aff. at 13). Dr. Van also adds that "I am of the opinion that within reasonable medical probability I would have prevailed as my hearing (sic) because there were so many false medical facts that no reasonable hearing panel member would vote in favor of the MEC recommendation." *See* Id. Because these statements are conclusory, speculative and unhelpful opinion, the Court finds it inappropriate to rely on this evidence at this summary judgment stage and thereby grants Defendant's Motion to Strike these statements.

Dallas Hospital." Defs.' App. at 75.[9] As a result, the Committee recommended the following:

1. We feel Dr. Van needs a minimum of 6–12 months of intensive training in clinical cardiology, to include teaching of proper medical decision making and use of resources. An appropriate example would be an additional year of a university based cardiology fellowship program.

2. At the end of such program he should have his clinical competency critically assessed by the program director with a report to the Executive Committee.

3. We believe Dr. Van should not be able to practice at Medical City Dallas Hospital until he has completed this additional training. At that point he would be allowed to return to our hospital staff, initially as a Provisional staff member.

4. We would recommend that his first 25 hospital cases be reviewed by the Cardiology Performance Improvement Committee.

*See* Id. at 75–76.[10]

By letter dated March 2, 2000, Plaintiff was then invited to attend an upcoming Executive Committee meeting on March 13, 2000, to discuss the Ad Hoc Committee's report. *See* Defs.' App. at 1051. However, due to a previous engagement, Dr. Van requested that he be allowed to appear before the Executive Committee at a later date, a request which was granted. *See* Id. at 474.

In the meantime, on or about April 6, 2000, the Hospital and Plaintiff agreed to stay the submission of his application for reappointment and his peer review while they both sought an opinion from the National Practitioner Data Bank ("NPDB") as to whether a lapse in Plaintiff's medical staff privileges as a result of a decision not to reapply while peer review process was ongoing would have to be reported to the NPDB. *See* Defs.' Br. at 17; *see also* Defs.' App. at 482–483,486–489. Finally, on May 22, 2000, the NPDB responded to the parties by letter, stating that under its mandating procedures, if a hospital considers the physician to be "under investigation," then his failure to apply for reappointment and allowing his clinical privileges to expire would have to be reported to the NPDB. *See* Defs.' App. at 484–485. As a result, the Hospital lifted the stay on the peer review investigation and invited Dr.

---

9. More specifically, the Committee's conclusions, after reviewing twenty-four (24) charts of Plaintiff's patients at the hospital, charts generated from its questions regarding procedures performed in Dr. Van's office, as well as a review of his office echos and stress tests, were that:

1. He demonstrates poor decision making ability;

2. He demonstrates poor ability to use medical test selection in a logical fashion;

3. He demonstrates poor ability to assimilate data into logical conclusions;

4. He demonstrates poor ability to organize information in a coherent manner;

5. Chart documentation often omitted essential information and was disorganized and confusing to the point where we could not follow his logic;

6. [The Committee] reviewed a number of Dr. Van's echocardiograms, since they played an important role in admission and hospital interventions. [It] found the images to be technically poor and his interpretations to reflect marginal competency; and

7. There was an overall tendency to over utilize testing in a manner that suggested that he had not properly thought through his diagnostic approach.

*See* Defs.' App. at 75–76 (specifically noted cases omitted).

10. Meanwhile, the Plaintiff's position here is that the Ad Hoc Committee's report was issued without sufficient specificity, in order to allow him to adequately respond to these accusations. *See* Pl.'s Resp., Exh. B. at 16 (Van Aff. at 16).

Van to appear at the upcoming 2000 Executive Committee's meeting on July 10, 2000. *See* Id. at 490. Additionally, the Hospital provided Plaintiff with an extension until June 27, 2000 to submit his application for reappointment. *See* Id.[11]

Eventually, on August 30, 2000, the Hospital sent a letter to Plaintiff, informing him that the Board of Trustees, at their meeting of July 24, 2000, had noted the termination of his Medical Staff membership and privileges as of June 27, 2000, due to the non-return of his reappointment application. *See* Id. at 508. And since he had allowed his privileges at the Hospital to lapse prior to the completion of the peer review investigation, the Hospital further informed Dr. Van that a report of this information had been forwarded to the Texas State Board of Medical Examiners and to the NPDB. *See* Id. Finally, due to the lapse in the Plaintiff's privileges, the Hospital decided to discontinue its peer review investigation of him. *See* Reply at 5–6.

## DISCUSSION

### I. The Parties Claims

In this action, Dr. Tuong B. Van asserts a right of recovery against Defendants under the Civil Rights Act of 1871, 42 U.S.C. § 1981, for discrimination based on his race and/or his national origin. *See* Pl.'s Orig. Comp. at 7–9. First, Plaintiff contends that Defendants engaged in a conspiracy against him which impaired his ability to make and enforce contracts, including (1) his contracts with Defendant Hospital for hospital privileges, (2) his contracts with his patients at the Hospital, (3)

his license with the Texas Board of Medical Examiners, and (4) his contracts with insurance carriers that provide payment for his services for patients at the Hospital. *See* Id. at 7. Plaintiff also alleges that Defendant Schwade acted as a co-conspirator with Defendant Anderson to abuse the peer review process in persuading the Credentials Committee to recommend revocation or the non-renewal of his privileges. *See* Id. at 8.

Second, Dr. Van also asserts a cause of action against the Hospital for breach of contract, a contract which he claims was created by the Medical Staff Bylaws as between himself, his patients and the Hospital, and under whose terms he is entitled to be eligible for medical staff membership. *See* Id. at 9.

A third cause of action brought by Dr. Van seeks a declaratory judgment that Defendants have threatened and indeed took action not to renew Plaintiff's privileges because of his race. *See* Id. at 10. Moreover, Plaintiff also seeks a declaration from this Court that the illegal actions of the Defendants were in bad faith, with malice, without due process, and not immune from liability under either the Federal Healthcare Quality Improvement Act, 42 U.S.C. § 11111 *et seq.*, or Texas' version of the statute contained in Article 4495b Tex.Rev.Civ. Stat. Ann. § 5.06. *See* Id.

Finally, as to Defendants Anderson and Schwade, Dr. Van also brings a defamation claim for publishing to third-parties that Plaintiff provided inappropriate care to one or more of his patients, *see* Id. at 10–11, and that these Defendants wrongfully

---

**11.** The Court here notes that sometime prior to the issuance of the Ad Hoc Committee's report, on or about February 7, 2000, the credentials coordinator at the Hospital also sent Dr. Van a letter attaching an application for reappointment and requiring him to return it to the Hospital by March 1, 2000. *See*

Defs.' App. at 56 (Van Dep. at 579). Although Plaintiff's privileges were scheduled to naturally terminate on May 30, 2001, he acknowledges in his deposition not returning the application by this date (thus allowing his privileges to lapse). *See* Id.; *see also* Defs.' Br. at 16.

and intentionally interfered with his contractual relationships with the Hospital, the Texas Board of Medical Examiners, and those contracts with his patients and their respective insurance companies. *See* Id. at 10–12.[12]

Meanwhile, Defendants move this Court for relief claiming that summary judgment is proper in that (1) Plaintiff is not entitled to pursue Section 1981 claims, and even if he were, his claims fail as a matter of law; (2) Defendants are immune under the Health Care Quality Improvement Act and the Texas Peer Review Immunity Statutes; and (3) Plaintiff's claims related to breach of contract and defamation also fail as a matter of law. *See* Defs.'s Br. at 21–50. Each of these arguments will be considered in turn.

## II. Summary Judgment Standard

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All evidence and the reasonable inferences to be drawn therefrom must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

The moving party bears the burden of informing the district court of the basis for its belief that there is an absence of a genuine issue for trial, and of identifying those portions of the record that demonstrate such an absence. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has made an initial showing, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The party defending against the motion for summary judgment cannot defeat the motion unless he provides specific facts that show the case presents a genuine issue of material fact, such that a reasonable jury might return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. *Id.* at 248–50, 106 S.Ct. 2505; *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619 (5th Cir.1993). In other words, conclusory statements, speculation and unsubstantiated assertions will not suffice to defeat a motion for summary judgment. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996) (en banc). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which he bears the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. The Court will not, in the absence of any proof, assume that the nonmoving party could or would prove the essential facts necessary to support a judgment in favor of the nonmovant. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075–1076 (5th Cir. 1994).

---

**12.** Plaintiff also includes some language in his Complaint adding that he also brings this suit "as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all patients of Asian descent who have been the victim[s] of discrimination by the Defendants." *See* Id. at 12. The Court, however, in its Order dated July 12, 2001, disposed of these purported class claims by denying class certification to Plaintiff. *See* Memorandum Opinion and Order 7/12/2001.

Finally, the Court has no duty to search the record for triable issues. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.1998). "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which the evidence supports his or her claim." *Id.* A party may not rely upon "unsubstantiated assertions" as competent summary judgment evidence. *Id.*

## III. Intentional Race Discrimination under Section 1981

Section 1981 provides that "all persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a) (2001).[13] Claims of racial discrimination brought under this statute are governed by the same evidentiary framework applicable to claims of employment discrimination brought under Title VII. *See Harrington v. Harris*, 118 F.3d 359, 367 (5th Cir. 1997) (citing *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 n. 2 (5th Cir.1996)). Thus, in order to establish a violation under Section 1981, the plaintiff must prove a *prima facie* case of intentional discrimination. *See Bellows v. Amoco Oil Co.*, 118 F.3d 268, 274 (5th Cir.1997) (citing *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir.1996)).

■ As a threshold matter, to establish a claim under Section 1981, a plaintiff must allege facts that show: (1) he is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned the "making and enforcing" of a contract. *See Id.* (citing *Green v. State Bar of Texas*, 27 F.3d 1083, 1086 (5th Cir.1994)); *see also*

*Daniels v. Worldcom Corp.*, No. CIV.A. 3:97–CV–0721–P, 1998 WL 91261 at *5 (N.D.Tex. Feb.23, 1998) (Solis, J.) (acknowledging the need for plaintiff to show the existence of a contract between himself and defendant in order to maintain a Section 1981 action). The Court shall now address each of these elements.

### A. Plaintiff's Contract with the Hospital and Drs. Schwade and Anderson

Dr. Van asserts in his Complaint that Defendants have discriminated against him in his ability to make and enforce contracts, "including his contracts with the Defendant Medical City Dallas Hospital for hospital privileges." Pl.'s Orig. Compl. at 7. In addition, Plaintiff argues that the medical staff's bylaws also constitute a contract, one to which the Hospital made itself a party by its adoption of them. *See* Pl.'s Resp. at 19.

■ Under Texas law, an important distinction exists between (a) medical bylaws, which are bylaws created by the medical staff to control the governance of the medical professionals with privileges at the hospital, and (b) hospital bylaws, which are a set of bylaws created by the hospital itself and adopted by its governing board. *See Gonzalez v. San Jacinto Methodist Hosp.*, 880 S.W.2d 436, 438 (Tex.App.Texarkana 1994, writ denied). Under the former, it is generally understood that rights promulgated by *medical staff bylaws* are considered incapable of creating an enforceable contract between the hospital and its physicians. *See Weary v. Baylor Univ. Hosp.*, 360 S.W.2d 895, 897–898 (Tex.Civ.App.Waco 1962, writ ref'd n.r.e.); *see also Stephan, M.D. v.*

---

13. For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. *See* 42 U.S.C. § 1981(b) (2001).

*Baylor Medical Ctr. at Garland,* 20 S.W.3d 880, 887 (Tex.App.—Dallas 2000, no writ). However, under the latter, procedural rights prescribed under *hospital bylaws* may constitute contractual rights between the physicians and the adopting hospital. *See Gonzalez,* 880 S.W.2d at 438–39; *see also Stephan,* 20 S.W.3d at 887. Federal courts applying Texas law have also adhered to this view. *See Monroe v. AMI Hosp. of Tex., Inc.,* 877 F.Supp. 1022, 1029 n. 5 (S.D.Tex.1994) ("This court notes, however, under Texas law, a hospital's medical staff bylaws do not constitute a contract between a hospital and its medical staff members").

█ In this case, the Medical Staff Bylaws in place at the Hospital provided in their preamble that the medical staff was "responsible for the quality of medical care in the hospital and for the ethical conduct and professional practices of its members and must accept and discharge this responsibility, *subject to the ultimate author-*

ity of the hospital Governing Body...." Defs.' App. at 698, 779, 853, 928 (emphasis added).[14] Moreover, the Medical Staff Bylaws provided that "no member shall be entitled to or have a vested right of renewal of his membership and privileges... and each shall be considered for renewal on an 'ab initio' basis." Id. 709–710, 790–791, 869, 940. As such, "no member shall be reappointed in the same or another Staff category without prior specific review and evaluation of the member's performance and qualification by the Chief of his respective Section, Medical Director (as appropriate), the Privileges and Credentials Committee, Executive Committee and [the] Board of Trustees."[15]

Here, although the various hospital committees, including the Executive Committee, were charged with making recommendations on a member's reappointment application under the medical staff's bylaws, *see* Footnote 14 *supra,* the final authority on this decision rested solely with

14. The Hospital's "Governing Body" is defined to mean the Board of Trustees of Medical City Dallas Hospital. *See* Defs.' App. at 699, 780, 854, 929.

15. Briefly summarized, upon the receipt of a candidate's reappointment application by the Hospital, the Medical Staff Bylaws in operation at the time of Plaintiff's Complaint provided for each of the following steps:

(a) at least 30 days prior to the end of the staff member's reappointment period, the Section Chief... shall begin a review and evaluation of the individual member's staff membership activity and clinical privileges.
(b) prior to the meeting of the Privileges and Credentials Committee, the Section Chief shall make a report to that committee recommending or not recommending the reappointment. Where reappointment is not recommended... the reasons therefore shall be stated and documented.
(c) at their next meeting, the Privileges and Credentials Committee shall review the written report of the Section Chief, and shall make a report to the Executive Committee, recommending or not recommending the reappointment. Where reappoint-

ment is not recommended... the reasons therefore shall be stated and documented.
(d) the Executive Committee then shall make a written report, through the President of the Medical Staff, recommending or not recommending to the Governing Body, the reappointment of that staff member at the next meeting of the Governing Body. Where reappointment is not recommended... the reasons therefore shall be stated and documented.
(e) Finally, in the case of an unfavorable report by the Executive Committee to the Governing Body, the staff member shall have the right to a fair hearing and appeal, as set forth in Article VII of these Bylaws. Such remedy shall be the sole and exclusive remedy available. Additionally, unless further action is taken under these Bylaws regarding summary suspension, the then current status of the member... shall remain in effect pending final action of the Governing Body.
*See* Defs.' App. at 711–712, 792–793, 866–867, 942–943.

the Hospital's Governing Body. *See* Defs.' Br. at 22. Therefore, the Court finds that no contract was created between Plaintiff and the Defendant Hospital simply by virtue of the fact that Dr. Van had been granted staff privileges at the hospital. *See Weary,* 360 S.W.2d at 897 (concluding medical staff bylaws did not constitute a binding contract because bylaws only permitted the staff to recommend and advise on reappointments, and also noting that the governing board had final authority and was under no obligation to accept or reject the recommendations of the staff); *see also Stephan,* 20 S.W.3d at 888 (finding that medical staff bylaws which do not attempt to define or limit the hospital's power to act through its board of trustees do not create contractual obligations).

Moreover, the Plaintiff in this case cannot present any evidence of interference with his privilege to practice at the hospital, since it is unrebutted that Dr. Van's staff privileges were never revoked, but that his privileges were terminated on June 27, 2000 when he voluntarily allowed his privileges to lapse. *See Gillum, D.O. v. Republic Health Corp.,* 778 S.W.2d 558, 565 (Tex.Civ.App. -Dallas 1989, no writ) ("in order to sustain a cause of action for tortious interference with a contract, there must be a valid, existing contract subject to interference ... [t]here was no evidence that [defendants] had interfered with any existing contract of Gillum except insofar as Gillum was granted the privilege of practicing at the hospital, and Gillum does not contend that his staff privileges were revoked").[16] As such, in the absence of the existence of a contract with the Defendant Hospital, Plaintiff has failed to satisfy a necessary element for maintaining his Section 1981 action.

Similarly, Plaintiff's Section 1981 claims against Defendants Anderson and Schwade also fail here since he has not provided the Court with any evidence to prove the existence of a contractual relationship with either of them outside his alleged contract with the Defendant Hospital based on being granted staff privileges or its adoption of the medical staff bylaws. *See* Pl.'s Orig. Compl. at 7.

■ Nevertheless, even if the Court were to find that the medical staff's bylaws here created some form of contractual-procedural rights for the Plaintiff, *see Gonzalez,* 880 S.W.2d at 439, Dr. Van's only allegation that can be interpreted as an "interference" by Defendants with his rights rests on the claim that he was denied a right to a fair hearing when the 1999 Executive Committee withdrew its negative recommendation against him, resulting in the disbandment of the investigative panel. *See* Pl.'s Resp., Exh. at 13 (Van Aff. at 13). However, by its own terms, the medical staff's bylaws on which Dr. Van relies makes it clear that it is the Hospital's Governing Body who would have had the ultimate say in any decision involving his possible reappointment to the medical staff. Additionally, as the Defendants correctly point out, there is no evidence in the record to indicate that the bylaws required the completion of the hearing once it was determined that information before the Committee was incorrect or incomplete. *See* Defs.'s Reply at 16 n. 13. In fact, the Committee's actions in ending the hearing could have only ad-

**16.** Dr. Van asserts here that the reason for not submitting his reappointment application was because: "[he] knew that [he] would no longer be able to maintain a medical practice at [the Hospital] to serve [his] patients, including Asian patients, and elected not to apply for a renewal of [his] privileges which expired on or about May 30, 2000." *See* Pl.'s Resp., Exh. B at 14 (Van Aff. at 14). However, Plaintiff has not raised any facts that would suggest this decision was anything other than a voluntary decision.

vanced the cause of fairness for Plaintiff, by refusing to base a recommendation to the Governing Body on the analysis of questionable evidence. Therefore, the Court holds that, even if a contract existed, Defendants' actions did not constitute a breach of that contract. As such, Plaintiff's Section 1981 claims against the Hospital and Drs. Anderson and Schwade must fail as a matter of law.

## B. Plaintiff's Contract with His Patients and Their Insurers Carriers

■ Dr. Van also asserts that the Defendants' discriminated against him, in violation of Section 1981, by impacting "contracts with his patients at the Hospital... and contracts with insurance carriers that provide payment for his services for patients at the Hospital." Pl.'s Orig. Compl. at 7.[17] Moreover, Plaintiff adds that he had "existing contracts under the terms of which he treated patients who agreed to pay him for his services." Pl.'s Resp. at 19.

Dr. Van is correct in pointing out that, under Texas law, some courts have recognized the existence of claims for the tortious interference with the doctor-patient relationship where doctors have sued third parties for interfering with their patient base. *See Gillum*, 778 S.W.2d at 565 (citing prospective patient referrals among contractual relations arguably subject to interference); *see also Davis v. West Community Hosp.*, 755 F.2d 455, 466 (5th Cir. 1985) (same holding, but noting the re-

quirement of proof of malice by defendant and actual damages or loss by the plaintiff required for recovery). However, in his deposition, Plaintiff admitted that (1) he had continued to admit Asian, Hispanic, Black, and Caucasian patients to the hospital following September 30, 1998, (the date on which he received notice of the Executive Committee's recommendation of denial on his reappointment application), until his privileges expired in June of 2000. *See* Defs.' App. at 32, 36 (Van Dep. at 470–471, 485). Plaintiff further admitted in his testimony that (2) he did not have an exclusive arrangement with any of his patients, and that at any time they could stop seeing him and start seeing any other doctor they wished. *See Id.* at 45 (Van Dep. at 522). Moreover, he also acknowledged that (3) he stopped advertising for patients in Vietnamese papers and that this action caused a reduction in his patient load as well as a decline in his revenues. *See Id.* at 36–37 (Van Dep. at 485–489). Therefore, based on the summary judgment evidence before it, the Court finds that Plaintiff cannot establish sufficient evidence to prove that Defendants' alleged actions interfered with his rights to "make and enforce contracts" with his non-exclusive patients.

Additionally, insofar as the Plaintiff attempts to bring forward a Section 1981 violation relative to his "contracts with insurance carriers that provide payment for his services for patients at the hospital," *see* Pl.'s Orig. Compl. at 7, admissions (1), (2) and (3) above further negate any possi-

---

**17.** In addition, Plaintiff has alleged that Defendants' discrimination impacted "his license with the Texas Board of Medical Examiners." *See* Pl.'s Orig. Compl. at 7. However, in his Response to Defendants Motion for Summary Judgment, Dr. Van acknowledged that his medical licenses in Texas, California and Louisiana have *not* been restricted (except for maybe some *potential* negative impact in the future due to hospital's report to the NPDB). *See* Pl.'s Resp. at 20. Under

these circumstances, the Court finds this allegation insufficient to support a Section 1981 claim on this basis. *See Stephan*, 20 S.W.3d at 891 (dismissing claim of tortious interference with contractual relations when Plaintiff could not point to any evidence of a contract or a prospective contract with his patients that was interfered with or damaged in any way as a result of hospital's publication to the NPDB of the adverse action taken against him).

ble effect or interference on the part of the Defendants with Dr. Van's ability to "make and enforce contracts" with his patients insurance carriers. Because his privileges were not revoked and he continued to admit patients until he voluntarily permitted his privileges to lapse, there is simply no evidence of interference with any of these contracts to speak of.

## C. Evidence of Discrimination

Nevertheless, even if the Court were to assume that Plaintiff could in fact establish that the alleged discrimination by Defendants concerned the "making and enforcing" of his contracts, to succeed under his Section 1981 claims, Dr. Van must also demonstrate that Defendants had the intent to discriminate against him based on his race. *See Bellows,* 118 F.3d at 274.[18]

■ The Court's inquiry for intentional race discrimination is essentially the same for actions under Section 1981 as it is for actions under Title VII. *See Harrington,* 118 F.3d at 367. Thus, a plaintiff may establish a *prima facie* case of discrimination using either the tripartite burden-shifting test established by the Supreme Court in *McDonnell Douglas v. Green,* 411 U.S. 792, 802–804, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *see also Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 404 (5th Cir.1999), or he can prove a *prima facie* case through the use of direct evidence of discriminatory motive. *See Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047–1048 (5th Cir.1996).

■ Direct evidence of discrimination is evidence that proves the defendant acted with discriminatory intent, without the need for inference or presumption. *Mooney v. Aramco Serv. Co.,* 54 F.3d 1207, 1217 (5th Cir.1995). If he can show some

direct evidence of discrimination, the burden of proof then shifts to the defendant, who must then show by a preponderance of the evidence that the employment decision would have been made regardless of discriminatory intent. If the defendant cannot show this, the employee prevails. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 249, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Mooney,* 54 F.3d at 1217.

■ If direct evidence is unavailable, as is typically the case, a prima facie case is established by proving: (1) that the plaintiff is a member of a protected class; (2) that he was at all times qualified for the position at issue; and (3) that the defendant made an adverse employment decision despite the plaintiff's qualifications. *Sreeram, M.D. v. Louisiana State Univ. Med. Ctr.-Shreveport,* 188 F.3d 314, 318 (5th Cir.1999).

If the plaintiff successfully establishes a prima facie case, he has raised a rebuttable presumption of discrimination and the employer must then respond with a legitimate, nondiscriminatory reason for its decision. *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 222 (5th Cir.2000). However, if the employer can then carry its burden, "the mandatory inference of discrimination created by the plaintiff's prima facie case drops out of the picture." *Id.* (*citing St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511–512, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). At that point, summary judgment is appropriate unless the plaintiff can prove that the defendant's rationale is pretextual. *Sreeram,* 188 F.3d at 318. However, the ultimate burden of persuasion here remains always with the plaintiff. *Marcantel v. Louisiana Dep't of Transp.,* 37 F.3d 197, 200 (5th Cir.1994).

---

**18.** Defendants here do not challenge Plaintiff's protected status under Section 1981 as a member of a racial or ethnic minority.

In this case, Dr. Van asserts several grounds he believes establish the Defendants' race-based discrimination against him: (1) Dr. Anderson allegedly made two remarks that Plaintiff interpreted as race-based threats; (2) there were several errors in the attachment to the Performance Committee's Report and a sham peer review was instituted against Plaintiff to remove him from the Hospital's medical staff because of his race; (3) there was targeting by the Defendants of other minority cardiologists for removal from the medical staff, and (4) other evidence of harassment including (a) the Hospital's refusal to hire interpreters for Plaintiff's Asian patients, and (b) the refusal of a request for a patient's transfer from another hospital. *See* Pl.'s Orig. Compl. at 7–8.[19] Each of these are discussed below.

### 1. Direct Evidence

■■■ "Remarks may serve as sufficient evidence of discrimination if the offered comments are: 1) race related; 2) proximate in time; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue." *See Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir.1996) (applying the test in an age discrimination context). However, for a remark to be probative of discriminatory intent, it must be "direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that race was an impermissible factor in the decision to terminate the employee."

*EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir.1996).

■■■ Dr. Van's asserted race-based threats in this case center around statements allegedly made to him by Dr. Anderson (1) during a telephone conversation in early February 1998, when he stated "he [Dr. Anderson] had been receiving (sic) a complaint from one or more of the nurses regarding [Plaintiff's] Oriental patients and that if [Plaintiff] did not take some unspecified action about [his] Oriental patients [Plaintiff] would be peer reviewed"; and (2) again in December 1998, when he stated that "because [Plaintiff] had not listened to him and not done more about [his] Oriental patients, that it would now have a detrimental effect upon [Plaintiff's] career." Pl.'s Resp., Exh. B at 2, 14 (Van Aff. at 2, 14). Although Dr. Anderson's statements could well be interpreted as evidence of a general bias against "Oriental patients," they are not so clear as to provide evidence of any direct racial bias against Dr. Van. In fact, these statements require too many inferences and presumptions to reach such a conclusion, as Plaintiff himself acknowledges, their meaning is quite unclear. *See* Defs.' App. at 1143 (Van Dep. at 303) (confessing, "I didn't know what he wanted me to do"). As such, the Court finds that Dr. Anderson's statements are insufficient to constitute evidence of "direct discrimination," and so the Court shall proceed to examine this evidence under the *McDonnell Douglas* burden shifting approach.

---

**19.** Plaintiff has not re-urged in his Response or further provided the Court with any evidence identifying these "other minority cardiologists" who were allegedly targeted for removal by the Defendants because of their race. Defendants, meanwhile, have provided evidence to the Court indicating that among the minority cardiologists no longer at the Hospital, Drs. Liu, Ogahafua and Stewart, were not terminated but resigned their privileges. *See* Defs.' Br. at 18 n. 13. Additionally,

Defendants have provided evidence to the Court indicating that the Hospital terminated the privileges of a Caucasian male cardiologist in 1998 and ordered the monitoring of another's charts. *See* Id. (*citing* Defs.' App. at 687D, 2053). The Court also notes here that Plaintiff's evidence of "other harassment" was summarily refuted by the summary judgment evidence in this case previously noted in Footnote 4 *supra*.

*See Sandstad v. CB Richard Ellis, Inc.,* No. CIV.A. 3:99–CV–2352–P, 2001 WL 611174 at \*5 (N.D.Tex. June 4, 2001) (Solis, J.).

## 2. Indirect Evidence

 As noted previously by the Court, a prima facie case is established by proving: (1) that the plaintiff is a member of a protected class; (2) that he was at all times qualified for the position at issue; and (3) that the defendant made an adverse employment decision despite the plaintiff's qualifications. *See Sreeram,* 188 F.3d at 318.

Dr. Van includes allegations in this case that both Dr. Anderson and Dr. Schwade constantly harassed him throughout 1998 and early 1999, by repeatedly reviewing his charts, and in particular his cath lab procedures, allegedly looking for any possible problem with which they could justify illegal peer review actions, or for some excuse to remove him from the staff. *See* Pl.'s Orig. Compl. at 4–5. However, the evidence before the Court establishes that the first documented targeted review against Plaintiff occurred only after Dr. Brown complained to Dr. Schwade regarding some concerns which had arisen from an excessive number of catheterizations which had been performed on a patient of Dr. Van's. *See* Defs.'s App. at 1296, 1301–1302 (Schwade Dep. at 14, 19–20); *see also* Defs.' App. at 1173–1174 (Bernhagen Dep. at 15–16). Afterwards, at the behest of Dr. Schwade, the Performance Committee commenced a six-month targeted review of Plaintiff's cases. *See* Defs.' Br. at 8. Dr. Schwade's testimony also indicates that Dr. Anderson was not involved in the decision to start this focused review and never indicated to him that he wanted Plaintiff to be peer reviewed. Defs.' App. at 1337 (Schwade Dep. at 55). Later, Dr. Anderson, as Chief of Cardiology, also participated in the Performance Committee's investigation, and eventually signed off on the CPIC report (as had Dr. Schwade), which recommended denial of Dr. Van's reappointment application. *See* Defs.' Br. at 30.

Taking Dr. Van's allegations of Dr. Anderson's statements as true, as the Court must do at this summary judgment stage, and noting that during the April 1999 hearing numerous errors and false medical facts were discovered in both Dr. Schwade's testimony and in the attachment to the CPIC report, *see* Pl.'s Br. at 5–14 (Van Aff. at 2–13), the Court finds this evidence is sufficient to raise an issue as to whether Plaintiff was actually "qualified" and the initial peer review was bogus. However, even assuming this, the Court cannot find any evidence to support Dr. Van's allegations that he suffered some adverse employment action despite these qualifications. To the contrary, by his own admission, Plaintiff continued to enjoy admitting privileges at the hospital until he allowed them to expire in June of 2000. *See* Defs.' App. at 32, 36 (Van Dep. at 470–471, 485). Moreover, Plaintiff also admits that he voluntarily began reducing his practice at the hospital sometime after February 1998, to the point of electing not to reapply for renewal since he could no longer maintain a profitable practice at the hospital. *See* Footnote 16 *supra.*

Regardless, the Court notes that, once the CPIC report was revised by Dr. Schwade following the Plaintiff's comments, *see* Defs.' App. at 70, an independent investigation of Plaintiff's cases was conducted by an Ad Hoc Committee, which ultimately concluded that "Dr. Van's medical judgment is inadequate to properly practice cardiology within the standard of care at the Hospital." Id. at 75; *see also* Footnote 9 *supra.* No evidence of bias has ever been asserted by Plaintiff regarding these doctors, and so the Court is left with a chorus of unrebutted negative evaluations that aver sufficient evidence to mak-

ing a finding that Plaintiff was not at all times qualified for the position at issue. *See Sreeram*, 188 F.3d at 317 (affirming district court's finding of no prima facie case of discrimination under similar circumstances).

The Court is aware that, although alleged discriminatory remarks must be taken into account when analyzing the evidence supporting Plaintiff's allegations of pretext, *see Rios v. Rossotti*, 252 F.3d 375, 379–380 (5th Cir.2001) (*citing Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 225–229), there is no need to reach this evidence since it cannot find that Dr. Van has raised even a prima facie case of discrimination here. Regardless, there is no evidence in the record to support Plaintiff's allegations that Dr. Anderson's remarks in any way influenced the ultimate decisions here since Plaintiff allowed his privileges to expire before the peer review was ever concluded.

## IV. Breach of Contract

Dr. Van also asserts a cause of action against the Defendant Hospital for breach of contract, claiming that as a member of the medical staff, he and his patients enjoyed certain rights and privileges to be free from discrimination. *See* Pl.'s Orig. Compl. at 9. More specifically, Plaintiff alleges the medical staff bylaws formed a contract between the himself, his patients and the Hospital, whose terms were breached when the Hospital threatened action against Plaintiff's career, reputation and medical staff membership. *See* Id. at 9–10.

As the Court has previously found, no contract was created as between Plaintiff and the Hospital by virtue of having received staff privileges, or by the Hospital's adoption of the medical staff's bylaws. *See* III–A *supra*. For these reasons, the Court grants summary judgment to the Defendant as to this claim.

## V. Declaratory Judgment

Dr. Van also seeks a declaratory judgment in this case, asking the Court to declare "that the illegal actions of the Defendants were in bad faith, with malice, without due process, and not immune from liability either under the Federal Healthcare Quality Improvement Act, 42 U.S.C. § 11111 *et seq.*, or Texas' version of the statute contained in Article 4495b Tex.Rev. Civ. Stat. Ann. § 5.06." Pl.'s Orig. Compl. at 10. In the alternative, Plaintiff asks that the Court declare these statutes unconstitutional.

As previously discussed, there has been no showing that Plaintiff can establish even a prima facie case of discrimination, or that Defendants breached any purported contracts between himself and other parties. In light of this ruling, the Court does not find it necessary to address Defendants further contentions that they are entitled to immunity under the Health Care Quality Improvement Act or the Texas Peer Review Immunity statute with regards to Plaintiff's racial discrimination and breach of contract claims. *See Ginzburg v. Memorial Healthcare Systems, Inc.*, 993 F.Supp. 998, 1027 (S.D.Tex.1997).

## VI. Defamation

Dr. Van also brings claims for defamation against Defendants Anderson and Schwade for the publishing to third-parties on the Credentials Committee, as well as to officials in the cath lab and to the CEO of the Hospital, that he provided inappropriate care to one or more of his patients. *See* Pl.'s Orig. Compl. at 10–11. Plaintiff further complains that these Defendants also falsely published that his cath lab privileges were summarily suspended. *See* Id. at 11.

Texas law defines defamation as "a defamatory statement orally commu-

nicated or published to a third person without legal excuse." *Halbert v. City of Sherman,* 33 F.3d 526, 530 (5th Cir.1994); *Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d 640, 646 (Tex.1995). In order to prevail on a defamation claim, the plaintiff must show that the person publishing the allegedly defamatory statement knew or should have known that the statement was false. *See Foster v. Laredo Newspapers, Inc.,* 541 S.W.2d 809, 819 (Tex.1976), *cert. denied,* 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977). Truth represents an absolute defense to a cause of action for defamation which, if proved, entirely defeats the plaintiff's claim. *Randall's Food,* 891 S.W.2d at 646; *see also McIlvain v. Jacobs,* 794 S.W.2d 14, 15 (Tex.1990).

■■■■ A claim for defamation may also be avoided if the defendant's statements were qualifiedly privileged. "A qualified privilege protects statements made in good faith on a subject matter in which the author has an interest or with reference to which he has a duty to perform to another person having a corresponding interest or duty." *Halbert,* 33 F.3d at 530 (citing *Houston v. Grocers Supply Co.,* 625 S.W.2d 798, 800 (Tex.App.-Houston [14th Dist.] 1981, no writ)). A statement, though privileged, may nevertheless be actionable if it is shown that the publisher was motivated by actual malice at the time the statement was made. *See Randall's Food,* 891 S.W.2d at 646. In connection with defamation claims, actual malice refers not to ill will but rather to "the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true." *Duffy v. Leading Edge Prods., Inc.,* 44 F.3d 308, 313 (5th Cir.1995) (quoting *Carr v. Brasher,* 776 S.W.2d 567, 571 (Tex.1989)). Clear

and convincing evidence of malice is required in order to defeat a qualified privilege. *Id. (citing Howell v. Hecht,* 821 S.W.2d 627, 630 (Tex.App.—Dallas 1991, writ denied)). Furthermore, whereas Texas courts ordinarily place the burden on the defendant to prove lack of malice on summary judgment, in a federal forum it is the plaintiff who, under the applicable summary judgment standard, must adduce proof of malice in order to avoid entry of summary judgment against her, since state law requires the plaintiff to demonstrate such malice at trial. *Compare Randall's Food,* 891 S.W.2d at 646 (holding that an employer must conclusively establish absence of malice on summary judgment) *with Duffy,* 44 F.3d at 313 (citing *Celotex* to conclude that the burden of showing malice rests upon the plaintiff); *see also ContiCommodity Servs., Inc. v. Ragan,* 63 F.3d 438, 443 (5th Cir.1995).

Defendants here assert they are entitled to summary judgment on all of Plaintiff's state law claims, including this cause of action for defamation, based upon immunity under the Healthcare Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11111 *et seq.,* and the Texas Peer Review Immunity Statutes, Tex. Occ.Code Ann. § 160.001 *et seq.* These arguments shall be addressed below.

## A. The Healthcare Quality Improvement Act

■■■ The HCQIA was enacted to provide for effective peer review and interstate monitoring of incompetent physicians, and also to provide qualified immunity for peer review participants. *Austin v. McNamara, M.D.,* 979 F.2d 728, 733 (9th Cir.1992). In furtherance of the latter goal, the HCQIA states that if a "professional review action[20] of

---

**20.** A "professional review action" means "an action or recommendation of a professional body which is taken or made in the conduct

of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct af-

a professional review body[21] meets certain [specified] standards, then (A) the professional review body, (B) any person acting as a member or staff to the body, (C) any person under contract or other formal agreement with the body, and (D) any person who participates with or assists the body with respect to the action, shall not be liable in damages under any law of the United States or any State ... with respect to the action." *See* 42 U.S.C. § 11111(a) (2001).

In order for immunity to apply under the HCQIA, the professional review action must be taken:

(1) in the reasonable belief that the action was in furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3) [above].

*See* 42 U.S.C. § 11112(a). The Act also includes a presumption that a professional review action meets each of the four prongs of Section 11112(a), unless the plaintiff can rebut the presumption by a preponderance of the evidence. *See* Id.;

see also *Brader v. Allegheny Gen. Hosp.*, 167 F.3d 832, 839 (3rd Cir.1999).

The standard for reviewing summary judgment under the HCQIA is therefore unconventional: although the defendant is the moving party, the court must examine the record to determine whether the plaintiff has "satisfied his burden of producing evidence that would allow a reasonable jury to conclude that the peer disciplinary process failed to meet the standards of HCQIA." *Brader*, 167 F.3d at 839. With the purpose of the HCQIA and its burden allocations in mind, the Court shall now examine Plaintiff's specific arguments as to why immunity should not attach to Drs. Anderson and Schwade for the initial peer review actions taken against him.

**1. Reasonable Belief that the Action Furthered Quality Health Care**

Dr. Van contends that he has raised material issues of fact as to whether Defendants Anderson and Schwade were motivated by something other than a reasonable belief that their actions would further the care of the Hospital's patients. More specifically, Plaintiff alleges that the combination of the direct racial threats made to him by Dr. Anderson, as well as the number of false errors included in the CPIC report which was produced by the Defendants for the Executive and the Privileges & Credential Committees, is sufficient evidence to create a fact issue for the jury. *See* Pl.'s Resp. at 27.

---

fects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician." *See* 42 U.S.C. § 11151(9).

**21.** A "professional review body" means "an activity of a health care entity with respect to an individual physician -

(A) to determine whether the physician may have clinical privilege with respect to, or membership in, the entity;
(B) to determine the scope or condition of such privileges or membership; or
(C) to change or modify such privileges or membership."
*See* 42 U.S.C. § 11151(10).

Most courts, in making this examination, have adopted an objective standard of reasonableness. *See Brader,* 167 F.3d at 839; *see also Sugarbaker, M.D. v. SSM Health Care,* 190 F.3d 905, 912–913 (8th Cir.1999) *cert. denied.* 528 U.S. 1137, 120 S.Ct. 980, 145 L.Ed.2d 931 (2000); *Mathews, M.D. v. Lancaster Gen. Hosp.,* 87 F.3d 624, 635 (3rd Cir.1996); *Imperial v. Suburban Hosp. Ass'n, Inc.,* 37 F.3d 1026, 1030 (4th Cir.1994); *Egan v. Athol Memorial Hosp.,* 971 F.Supp. 37, 42 (D.Mass.1997), *affirmed* 134 F.3d 361, 1998 WL 10266 (1st Cir. 1998). That is, the focus of this inquiry is not whether the investigating committee's initial concerns are ultimately proved to be medically sound. Rather, the objective inquiry focuses on whether the professional action taken against plaintiff was taken "in the reasonable belief that the action was in the furtherance of quality health care." *See Sugarbaker,* 190 F.3d at 913.

As previously stated, the evidence in this case establishes that the first documented targeted review of Plaintiff occurred only after Dr. Brown, a fellow cardiologist, complained to Dr. Schwade regarding some concerns which had arisen from an excessive number of catheterizations which had been performed on a patient of Dr. Van. *See* Defs.' App. at 1296, 1301–1302 (Schwade Dep. at 14, 19–20); *see also* Defs.' App. at 1173–1174 (Bernhagen Dep. at 15–16). Afterwards, at the behest of Dr. Schwade, the Performance Committee commenced a six-month targeted review of Plaintiff's cases. *See* Defs.' Br. at 8. Dr. Schwade's testimony also indicates that Dr. Anderson was not involved in the decision to start this focused review and never indicated to him that he wanted Plaintiff to be peer reviewed. Defs.' App. at 1337 (Schwade Dep. at 55). Only later did Dr. Anderson, as Chief of Cardiology, participate in the Performance Committee's investigation, and eventually sign off on the CPIC report (as had Dr. Schwade), which recommended the denial of Dr. Van's reappointment application. *See* Defs.' Br. at 30. Therefore, without focusing on whether the initial concerns of this investigation were ultimately proven to be medically sound, the evidence establishes that the initial peer review of Plaintiff was begun because of concerns raised by a fellow cardiologist, with which members of the Performance Committee, at least initially, agreed. *See* Id. at 8. As such, the Court finds that, even considered in a light most favorable to the plaintiff, the initial targeted review of Dr. Van's performance had the requisite "reasonable belief" to support the Defendants actions.

### 2. Reasonable Fact Gathering

In order to qualify for HCQIA immunity, Defendants must also have made a reasonable effort to obtain the relevant facts. *See* 42 U.S.C. § 11112(a)(2). In assessing this issue, the Court must consider whether the totality of the process leading up to the Hearing Committee's peer review action against Plaintiff evidenced a reasonable effort to obtain the facts of the matter. *See Mathews,* 87 F.3d at 637; *see also Brader,* 167 F.3d at 841.

Plaintiff asserts here that the CPIC report and its attachments, about which Dr. Schwade testified to at the Hearing Committee's April 1999 meeting, and which, as Plaintiff understands was the basis for both the Executive Committee and the Credential Committee's adverse recommendations against him, contained numerous mistakes regarding medical facts in some of the underlying cases included in the report. *See* Pl.'s Resp., Exh. B at 7–13 (Van Aff. at 6–12). Defendants agree that the CPIC report contained several inaccuracies, those which ultimately caused the Executive Committee to withdraw its adverse recommendation to deny Plaintiff's application for reappointment until further evaluation. *See* Defs.' Br. at 12. Howev-

er, Defendants state that it was Ms. Bernhagen, the Director of Quality Assurance at the Hospital, who had attached to the Performance Committee's recommendation this incorrect data which she had compiled from the catheterization laboratory, the non-invasive laboratory, and the physician reviews conducted of Dr. Van. *See* Defs.' Br. at 9; *see also* Defs.' App. at 63–65 (Memo with attachment of cases signed by Drs. Anderson and Schwade to Chair of Privileges & Credentials Committee), and at 1180 (Bernhagen Dep. at 26). In addition, both Defendants testified that they had relied on Ms. Bernhagen for accuracy in this data, and only reviewed the memo, but did not go back and cross-check or cross-reference to see if what was contained in the report's attachment was an accurate summary of what was reflected in the Hospital's charts. *See* Defs.' App. at 1512–1514 (Anderson Dep. at 33–34), 1367–1368 (Schwade Dep. at 85–86).

The facts of this case are similar to those present in *Brader.* The plaintiff in that case brought suit against a hospital alleging breach of contract in connection with several privileges and promotion decisions, as to which defendants asserted an immunity defense under the HCQIA. *Brader,* 167 F.3d at 834. There, after several hospital anesthesiologists had approached plaintiff's supervisor regarding some concerns over several procedures which had performed by the plaintiff, the Quality Assurance Department ("QAD") of the hospital was asked to compile data for each abdominal aortic aneurysm ("AAA") procedure performed. *Id.* at 836. The evidence, broken down for each physician, showed that plaintiff's cases accounted for over 50 percent of the mortality in the ruptured abdominal cases, whereas the other four doctors examined had approximately 10 percent each. *Id.* Thereafter, the director of the Division of General Surgery (Dr. Diamond), reviewed and compared the AAA procedures performed

by Brader and the other surgeons, and concluded that plaintiff's record reflected deficiencies in skill, as well as "unconscionable" judgment. *Id.* Dr. Diamond's report was later sent to an outside reviewer (Dr. Ochsner) who also found several problems with plaintiff's cases. *Id.*

Brader argued that the hospital's ensuing peer review and its decision to suspend him were not subject to immunity under the HCQIA because (1) Dr. Ochsner's external review was based in large part on Dr. Diamond's report, which contained faulty comparative data, and (2) the Ochsner report attributed complications to plaintiff that were caused by other physicians. *Id.* at 840. The Third Circuit, nevertheless, held that peer review immunity applied, despite the fact that the hospital had failed to include every AAA patient in a quality assurance review, or because Dr. Diamond's report had made one mistaken attribution to plaintiff in an otherwise considered thorough report. *Id.* The *Brader* Court noted that even assuming the flaws in the Diamond and Ochsner reports, these were not the only sources of information used by the hospital peer reviews in reaching their decisions concerning Brader's professional status. *Id.* at 841.

Similarly, although the evidence in this case shows that mistaken or incorrect data was included in the CPIC report submitted by Drs. Anderson and Schwade, those cases identified by Plaintiff, *see* Footnote 7 *supra,* were not the only evidence included in those reports. That is, Defendants recommendation also relied upon numerous other cases involving Plaintiff's treatment of his patients where no allegations of mistakes or errors have been made. Moreover, subsequent committees reviewing Plaintiff's cases, with no connection to either Drs. Anderson or Schwade, ended up having concerns over Plaintiff's treatment of his patients, sufficient to find that

"Dr. Van's medical judgment [was] inadequate to properly practice cardiology within the standard of care at Medical City Dallas Hospital." *See* Defs.' App. at 75 (Ad Hoc Committees' findings). On balance, the Court finds that these actions taken by Defendants were sufficient to constitute a "reasonable effort to obtain the facts."[22]

### 3. Adequate Notice and Hearing

Dr. Van does not contest here that he was not afforded adequate notice and hearing procedures in accordance with § 11112(a)(3). A review of the record confirms that Defendants complied with these procedures.

After receiving a letter from Stephen Corbeil, President and CEO of the Hospital in September 1998, notifying Plaintiff that the Executive Committee and the Privileges & Credentials Committee had recommended that his application for reappointment be denied, Plaintiff timely requested a hearing. *See* Pl.'s Resp., Exh. B at 5 (Van Aff. at 5 and Aff. Exh. B). This hearing was commenced on April 7, 1999, at which Dr. Van was allowed to opportunity to cross-examine Dr. Schwade testified regarding the CPIC report and its attachments. *See Id.* As such, the evidence is clear that Plaintiff was afforded an adequate notice and hearing as required under the HCQIA.

### 4. Reasonable Belief That Action Was Warranted

Finally, Dr. Van disputes whether Defendants' peer review action against him was taken in the reasonable belief that "it

was warranted by the facts known," as required under § 11112(a)(4) of the Act. The Court finds that, although there were undoubtedly mistakes made in compiling the first CPIC report submitted by Drs. Anderson and Schwade, the remaining portions of the information were sufficient to raise sufficient concerns about Plaintiff's practice as to initiate this peer review action. This conclusion is buttressed by the fact that every committee which subsequently looked at the evidence, after the report was revised but still including a number of cases contained in the first report, also found concerns with Plaintiff's treatment of some of his patients. Therefore, Plaintiff cannot rebut the presumption that the Defendants' actions were taken in the reasonable belief that they were warranted and Defendants' are entitled to immunity from Plaintiff's defamation cause of action under the HCQIA.[23]

### B. Texas Peer Review Immunity Statutes

In addition to the immunities granted by the HCQIA, the Act itself allows individual states to provide even further protection to medical peer review activities. *See Roe v. Walls Regional Hosp., Inc.*, 21 S.W.3d 647, 652 (Tex.App.-Waco 2000). Specifically, the HCQIA provides that: "nothing in this subchapter shall be construed as changing the liabilities or immunities under law or as preempting or overriding any State law which provides incentives, immunities, or protection for those engaged in a professional review action that is in addition to or greater than

---

**22.** Although there is evidence that independent occurrence reports were filed against Plaintiff by the Hospital's nursing staff, Defendants acknowledge that these played no part in triggering the initial focused review against Dr. Van. *See* Defs.' App. at 1501–1502 (Anderson Dep. at 22–23).

**23.** Plaintiff also argues that the Defendants should not be provided immunity because HCQIA is unconstitutional. *See* Pl.'s Resp. at 27–30. In light of the fact that the Court also finds *infra* that Defendants are entitled to immunity under the Texas Peer Review Immunity Statutes, it is unnecessary at this time to reach this constitutional question.

that provided by this subchapter." 42 U.S.C. § 11115(a); *see also St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 507 (Tex.1997) ("even if the Federal Act does not apply . . . this provision specifically allows states to implement their own initiatives to provide greater immunities in professional review actions than those the Federal Act provides").

To this end, the Texas Legislature in 1987 enacted section 5.06 of the Texas Medical Practice Act ("TMPA"), which under section 5.06 provided:

> (*l*) A cause of action does not accrue against the members, agents, or employees of a medical peer review committee or against the health-care entity from any act, statement, determination or recommendation made, or act reported, without malice, in the course of peer review as defined by this Act.

> (m) A person, health-care entity, or medical peer review committee, that, without malice, participates in medical peer review actively or furnishes records, information, or assistance to a medical peer review committee or the board is immune from any civil liability arising from such an act.

*See Roe*, 21 S.W.3d at 653 (*citing* Tex.Rev. Civ. Stat. Ann. art. 4495b § 5.06(*l*), (m) (repealed)). Thereafter, in 1989, the Texas Legislature enacted sections 161.031–161.033 of the Health and Safety Code, extending peer review immunity to members of a "medical committee":

> A member of a medical committee is not liable for damages to a person for an action taken or recommendation made within the scope of the functions of the committee if the committee member acts without malice and in the reasonable belief that the action or recommendation is warranted by the facts known to the committee member.

*See Roe*, 21 S.W.3d at 653 (*citing* Tex. Health & Safety Code Ann. § 161.033 (Vernon 1992)).

Currently codified in the Texas Occupations Code, immunity from civil liability is provided to:

> (1) a person who, in good faith, reports or furnishes information to a medical peer review committee or the board;

> (2) a member, employee or agent of the board, a medical peer review committee, or a medical organization district or local intervenor, who takes an action or makes a recommendation within the scope of the functions of the board, committee, or intervenor program, *if that member, employee, agent, or intervenor acts without malice and in the reasonable belief that the action or recommendation is warranted by the facts known to that person;* and

> (3) a member or employee of the board or any person who assists the board in carrying out its duties or functions provided by law.

Tex. Occ.Code Ann. § 160.010(a) (Vernon 2001) (emphasis added). As such, Texas has clearly taken the additional step of providing for more protection to the activity of medical peer reviews than those which the HCQIA provides. *See Roe*, 21 S.W.3d at 653 (citing *Agbor*, 952 S.W.2d at 507). Thus, the qualified immunity from liability conferred by these statutes to Defendants Anderson and Schwade can be defeated only by a showing that they acted with actual malice. *See Id.* The Court now turns to the issue of whether Plaintiff has provided summary judgment evidence raising a genuine issue of material fact on the question of malice.

## C. Evidence of Malice

 As previously noted by the Court, in the context of defamation, actual malice means "the making of a statement

with knowledge that it is false, or with reckless disregard of whether it is true." *Carr*, 776 S.W.2d at 571. "Reckless disregard" means that a statement is made with "a high degree of awareness of probable falsity." *Id.* To find actual malice, there must be "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *ContiCommodity*, 63 F.3d at 442–443 (quoting *Hagler v. Proctor & Gamble Mfg., Co.*, 884 S.W.2d 771, 771–772 (Tex.1994)); *see also Maewal, M.D. v. Adventist Health Systems/Sunbelt, Inc.*, 868 S.W.2d 886, 893 (Tex.App.-Fort Worth 1994, writ denied) (holding that a presumption of absence of malice applies to medical peer review committee actions in Texas, and that malice under TMPA means knowledge that an allegation is false or with reckless disregard for whether the allegation is false).

▬▬▬▬ When a qualified privilege is asserted as an affirmative defense, which Drs. Anderson and Schwade have both done, whether the statements are true is of no moment, unless there is clear evidence of actual malice. A plaintiff must first overcome the affirmative defense of qualified privilege to defeat summary judgment. *ContiCommodity*, 63 F.3d at 443. If a fact question exists whether a statement or comment was made with actual malice, that statement automatically loses qualified privilege status, and summary judgment would be inappropriate. *See Boze v. Branstetter*, 912 F.2d 801, 807 (5th Cir.1990). "Negligence, lack of investigation, or failure to act as a reasonably prudent person are insufficient to show

actual malice." *Duffy*, 44 F.3d at 313 (citing *Shearson Lehman Hutton, Inc. v. Tucker*, 806 S.W.2d 914, 924 (Tex.App.-Corpus Christi 1991, writ dismissed w.o.j.)). In the context of the summary judgment motion, Plaintiff must prove actual malice rather than Anderson or Schwade prove the absence of malice. *See Id.* at 314.

Dr. Van's evidence of malice essentially boils down to (1) Dr. Anderson's allegedly two race-based remarks made to him concerning his Oriental patients and (2) the errors discovered in the attachment to the CPIC report which was submitted to the peer review committees of the Hospital by both Drs. Anderson and Schwade. *See* Pl.'s Orig. Compl. at 7–8.

In *Egan v. Athol Memorial Hospital*, a case involving a physician's claims against a hospital and several members of its peer review committee, the District Court of Massachusetts reviewed allegations that defendants had engaged in a deliberate and willful conspiracy to remove plaintiff privileges at the hospital. *See* 971 F.Supp. at 45. Among the allegations asserted by plaintiff were that defendants had misstated medical records, ignored undeniable medical evidence, claimed violations of sound medical practice without medical support and did not fairly or justly do their jobs. *See Id.* However, the *Egan* Court found that, even indulging all reasonable inferences in plaintiff's favor, he had produced no evidence, beyond mere allegations, to show that anyone at the hospital had exaggerated or manufactured complaints or had a clear economic motive to deny privileges to him. *See Id.* at 44.[24]

---

24. The evidence against plaintiff in that case included: (1) an Incident Report filed by members of hospital's Maximum Care Unit ("MCU") noting that plaintiff had inadequately managed 3 MCU cases; (2) a report filed by three nurses claiming plaintiff had acted inappropriately and was suspected to be intoxicated; (3) plaintiff was often cited for incomplete and late medical charts; (4) a review conducted of plaintiff's discharge plans revealed that those plans accounted for up to 50% of the hospital's total readmissions; (5) other complaints from nurses, staff and physicians about plaintiff's professional behavior. *See Egan*, 971 F.Supp. at 40.

In this case, Dr. Van has presented evidence which establishes that the CPIC report's attachments contained false and misleading evidence attributing errors and criticisms of his medical practice, which Defendants essentially agree with. *See* Footnote 7 *supra*. However, a negligent failure to investigate the truth or falsity of a statement before publication, or a failure to act as a reasonably prudent person, is insufficient to support a finding of malice. *See Duffy*, 44 F.3d at 313. The Defendants testimony here, which is unrebutted by Plaintiff, is that each of them had relied on Ms. Bernhagen for accuracy in this data, and only reviewed the memo, but did not go back and cross-check or cross-reference to see if what was contained in the report's attachment was an accurate summary of what was reflected in the Hospital's charts. *See* Defs.' App. at 1512–1514 (Anderson Dep. at 33–34), 1367–1368 (Schwade Dep. at 85–86); *see also Maewal*, 868 S.W.2d at 890–890 ("Evidence which favors the movants' position will not be considered unless it is uncontroverted"). Moreover, the evidence is also unrebutted that Dr. Anderson was not involved in the decision to start the initial focused review of Dr. Van and never indicated to Dr. Schwade that he wanted Plaintiff to be peer reviewed. *See* Defs.' App. at 1337 (Schwade Dep. at 55). Only later, as Chief of Cardiology, did he participate in the Performance Committee's investigation, and eventually sign off on the CPIC report (which included the inaccurate data provided by Ms. Bernhagen).

Meanwhile, Plaintiff states in conclusory fashion that Drs. Anderson and Schwade acted as a co-conspirators to abuse the peer review process. *See* Pl.'s Orig. Compl. at 8. However, there is no evidence to support that the targeting or peer review of Dr. Van was due to any racial animus; on the contrary, the resounding weight of the evidence shows that other doctors and committees which reviewed Plaintiff's cases found it sufficient to raise a concern.

Given this evidence, or the lack thereof presented by the Plaintiff, the Court finds that Dr. Van cannot rebut the presumption that each Defendant acted without malice and in the reasonable belief that the action or recommendation taken against him was warranted *by the facts known to that person. See* Tex. Occ.Code Ann. § 160.010(a); *see also Seidenstein, M.D. v. National Medical Enterprises, Inc.,* 769 F.2d 1100, 1104 (5th Cir.1985) (holding that the standard for actual malice is a subjective one, calling the defendant's state of mind into question ... "[p]roof of falsity in fact is not enough, nor is proof of a combination of falsehood and general hostility" ... "[n]or can malice be inferred from the character of the language used, if privileged, without *other evidence* to prove it"). Accordingly, the Court shall grant summary judgment to the Defendants as to Plaintiff's cause of action for defamation.

## VII. Interference with Contractual Relations

██ Plaintiff brings a related claim against all the Defendants for the wrongful and intentional interference with his contractual relationships, including that of his medical staff membership, his medical license, and contracts with his patients and their insurance companies. *See* Pl.'s Orig. Compl. at 11. To recover for tortious interference with an existing contract, the plaintiff must prove: (1) the existence of a contract subject to interference, (2) the act of interference was willful and intentional, (3) such intentional act was a proximate cause of plaintiff's damage and (4) actual damage or loss occurred. *See Johnson v. Hospital Corp. of America,* 95 F.3d 383, 394 (5th Cir.1996) (*citing Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 939 (Tex.1991)). However, having previously

found that Dr. Van cannot demonstrate the existence of a contract between himself and the Hospital, *see* III–A *supra,* and that Plaintiff's privileges were never revoked, and he continued to admit patients until he allowed his privileges to lapse, *see* III–B *supra,* the Court shall grant summary judgment to the Defendants as to this claim.

### VIII. Plaintiff's Emergency Motion to Reopen Discovery and to Supplement Witness List

On January 20, 2002, Plaintiff filed an Emergency Motion to Reopen Discovery and Supplement Witness List, alleging that, after discovery was closed and the parties' witnesses were identified, Plaintiff's counsel received a letter from the Texas State Board of Medical Examiners ("Board") dated December 12, 2001. Pl.'s Emergency Mot. ("Pl.'s Emer.") at 1–2. In the letter, the Board stated that it had conducted a thorough review of all information and facts provided to it and had closed its investigation regarding Dr. Van without recommending any action because "the evidence [did] not indicate a violation of the Texas Medical Practice Act." Id. at 2. Plaintiff now seeks leave to add Lloyd E. McRae, Chief of Investigation for the Board, as a witness to authenticate the letter, which Plaintiff believes supports the conclusion that his practice of medicine at the Hospital was within the acceptable standard of care in the medical community. Id. at 3–4.

Even if the Court were to allow this evidence, it does not change the fact that, at the time these decisions were made by Defendants, there was sufficient basis to support their decisions. Having already held that Plaintiff cannot pursue his action against Defendants, the Court also need not decide whether there were different standards of review involved in the decisions made by Defendants and that made by the Board. Therefore, the Court shall deny Plaintiff's Emergency Motion as Moot.

### CONCLUSION

For the reasons stated above, having considered the summary judgment evidence, the applicable law, and the parties' arguments, the Court is of the opinion that Defendant's Motion for Summary Judgment shall be and is hereby GRANTED. Further, the Court finds that Defendants' Motion to Strike Evidence in Connection with Plaintiff's Consolidated Response shall be and is hereby GRANTED in PART and DENIED in PART as stated throughout this Order, with remaining parts being DENIED as MOOT. In addition, Plaintiff's Emergency Motion to Reopen Discovery and to Supplement the Witness List shall be and is hereby DENIED.

**So Ordered.**